**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE MEDICINES COMPANY, | ) |
| | ) |
| Plaintiff, | ) C.A. No. 09-750 (RGA) |
| | ) (Consolidated) |
| v. | ) |
| | ) |
| HOSPIRA, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF THE MEDICINES COMPANY'S RESPONSIVE POST-TRIAL BRIEF**

*Of Counsel*

Edgar H. Haug
Porter F. Fleming
Angus Chen
Frommer Lawrence & Haug LLP
745 Fifth Avenue
New York, NY 10151
(212) 588-0800


December 6, 2013

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Jason J. Rawnsley (#5379)
rawnsley@rlf.com
Richards, Layton & Finger P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700

*Attorneys for Plaintiff*
*The Medicines Company*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

I.      PRELIMINARY STATEMENT .................................................................................1

II.     NATURE AND STAGE OF THE PROCEEDINGS .................................................1

III.    SUMMARY OF THE ARGUMENT .........................................................................1

IV.     STATEMENT OF FACTS .........................................................................................3

        A.      The Medicines Company's Relationship with Ben Venue .....................3

        B.      The $Asp^9$-Bivalirudin Problem ...............................................................4

        C.      The Development of Improved Angiomax® .............................................4

        D.      The Results of the Co-Inventors' Investigation ......................................5

        E.      The Relationship with ICS Under the Distribution Agreement.............5

V.      ARGUMENT ..............................................................................................................6

        A.      Hospira's Invalidity Counterclaims Should Be Dismissed Because
                Hospira Improperly Relies on Documents Not Disclosed in
                Its § 282 Notice.......................................................................................6

        B.      The Patents in Suit Are Not Invalid Under § 102(b) Because the
                Inventions Were Not Ready for Patenting or Offered for Sale
                Before the Critical Date .........................................................................8

                1.      The Inventions Were Not Ready for Patenting Before the
                        Critical Date................................................................................8

                        a.      The Inventions Were Not Ready for Patenting
                                Because the Maximum $Asp^9$ of About 0.6% Was
                                Not Determined Until After the Critical Date..................8

                        b.      Hospira Does Not Contend that the Inventions
                                Were Reduced to Practice Before the Critical Date........9

                        c.      Hospira Does Not Cite to Any Enabling Drawings
                                or Descriptions.............................................................10

                                i.      The Validation Batches and Study Are Not
                                        Enabling Disclosures of the Inventions
                                        Because They Lack Critical Claim Elements ...................10

2. Improved Angiomax® Was Not Sold or Commercially Offered Before the Critical Date ...............................................11

   a. Ben Venue Never Sold Improved Angiomax® .............................11

      i. Ben Venue Was Merely a Service Provider .....................12

      ii. Ben Venue Did Not Have Title or Property Rights in Angiomax® ........................................................12

   b. The Medicines Company Did Not Offer to Sell Improved Angiomax® to ICS Before the Critical Date ..........................................................................................13

      i. Hospira Mischaracterizes the ICS Distribution Agreement ......................................................13

      ii. The Distribution Agreement Was Not an Offer to Sell.....................................................................14

      iii. Hospira Failed to Prove that the Distribution Agreement Concerned Improved Angiomax® ....................................................................15

      iv. Hospira Mischaracterizes the Certificates of Packaging ...................................................................16

C. The Prior Art Does Not Render the Patents in Suit Obvious................................17

   1. Hospira Cites Only One Prior-Art Document to Prove Obviousness ...........................................................................17

      a. The Patent Office Already Considered the References Hospira Relies Upon to Show Obviousness ...................................................................17

      b. Hospira's Multiple Unsupported Assertions that Certain Information Exists in the Prior Art Should Be Rejected ..................................................................18

   2. Hospira Manufactures Motivations Based on Nonpublic Information ...........................................................................19

   3. The Trial Evidence Refutes Hospira's Obviousness Arguments .............................................................................21

      a. The High Asp$^9$-Bivalirudin Problem Was Complex and Had Many Potential Variables .................................21

b.      It Was Not Obvious to Add Base Slowly and in a
Controlled Manner ......................................................................22

c.      It Was Not Obvious to Utilize High-Shear Mixing .......................23

4.      The Evidence of Nonobviousness Demonstrates that the
Patents in Suit Are Novel and Nonobvious ...............................................25

a.      The Prior Art Taught Away From the Inventions,
Which Produced Unexpected Results.............................................25

b.      Others Were Skeptical of the Inventions and Failed
Where the Inventors Succeeded.....................................................26

D.      The Asserted Claims Satisfy the Written-Description Requirement ....................26

E.      The Asserted Claims Are Enabled and Definite .................................................28

VI.     CONCLUSION...............................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012)..................................................................... 10, 18, 19

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
  776 F.2d 281 (Fed. Cir. 1985)................................................................................ 29

*Baxter Healthcare Corp. v. Fresenius Med. Care Holdings, Inc.*,
  No. 07-1359, 2010 U.S. Dist. LEXIS 21778 (N.D. Cal. Feb. 19, 2010) ......................... 13

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
  715 F.3d 891 (Fed. Cir. 2013)................................................................................ 30

*Cephalon Inc. v. Mylan Pharms. Inc.*,
  No. 11-164, 2013 U.S. Dist. LEXIS 101848 (D. Del. July 22, 2013) ............................ 19

*Clock Spring, L.P. v. Wrapmaster, Inc.*,
  560 F.3d 1317 (Fed. Cir. 2009).............................................................................. 8

*Creative Compounds, LLC v. Starmark Labs.*,
  651 F.3d 1303 (Fed. Cir. 2011).............................................................................. 18

*DatCard Sys., Inc. v. Pacsgear, Inc.*,
  No. 10-1288 Order (C.D. Cal. Apr. 1, 2013) .............................................................. 20

*Dey, L.P. v. Sunovion Pharm., Inc.*,
  715 F.3d 1351 (Fed. Cir. 2013)........................................................................... 19, 24

*Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*,
  533 F.3d 1353 (Fed. Cir. 2008)............................................................................. 21

*Enzo Biochem, Inc. v. Gen-Probe, Inc.*,
  424 F.3d 1276 (Fed. Cir. 2005)............................................................................. 14

*Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*,
  350 F.3d 1327 (Fed. Cir. 2003).............................................................................. 7

*Finisar Corp. v. DirecTV Grp., Inc.*,
  424 F. Supp. 2d 896 (E.D. Tex. 2006) ...................................................................... 8

*Grp. One, Ltd. v. Hallmark Cards, Inc.*,
  254 F.3d 1041 (Fed. Cir. 2001).............................................................................. 14

*Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*,
  726 F.3d 1370 (Fed. Cir. 2013)............................................................................. 15

*Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*,
    819 F.2d 1100 (Fed. Cir. 1987)................................................................................... 28

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
    343 F. Supp. 2d 272 (D. Del. 2004).............................................................................. 9

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
    676 F.3d 1063 (Fed. Cir. 2012)............................................................................ 20, 25

*In re Omeprazole Patent Litig.*,
    536 F.3d 1361 (Fed. Cir. 2008)............................................................................. 9, 10

*In re Soni*,
    54 F.3d 746 (Fed. Cir. 1995)..................................................................................... 21

*Invista N. Am. S.a.r.l. v. M&G USA Corp.*,
    No. 11-1007, 2013 U.S. Dist. LEXIS 88646 (D. Del. June 25, 2013)........................... 27

*Invitrogen Corp. v. Clontech Labs., Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005)................................................................................. 29

*Koito Mfg.Co. v. Turn-Key-Tech, LLC*,
    381 F.3d 1142 (Fed. Cir. 2004)................................................................................. 29

*Netscape Comm'ns Corp. v. ValueClick, Inc.*,
    684 F. Supp. 2d 699 (E.D. Va. 2010) ............................................................ 8, 11, 15

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008)................................................................................. 25

*Panduit Corp. v. Dennison Mfg. Co.*,
    810 F.2d 1561 (Fed. Cir. 1987)................................................................................. 28

*Personalized Media Commc'ns, LLC v. U.S. Int'l Trade Comm'n*,
    161 F.3d 696 (Fed. Cir. 1998)................................................................................... 30

*Pfaff v. Wells Elecs., Inc.*,
    525 U.S. 55 (1998)....................................................................................... 2, 8, 9

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
    566 F.3d 989 (Fed. Cir. 2009)................................................................................... 19

*Sciele Pharma Inc. v. Lupin Ltd.*,
    684 F.3d 1253 (Fed. Cir. 2012)................................................................................. 18

*Space Sys./Loral, Inc. v. Lockheed Martin Corp.*,
    271 F.3d 1076 (Fed. Cir. 2001)................................................................................... 9

*Special Devices, Inc. v. OEA, Inc.*,
    270 F.3d 1353 (Fed. Cir. 2001)................................................................................. 12

*Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*,
   620 F.3d 1305 (Fed. Cir. 2010)................................................................. 26, 28

*Stambler v. RSA Sec., Inc.*,
   243 F. Supp. 2d 70 (D. Del. 2003) ................................................................. 23

*Tech. Licensing Corp. v. Videotek, Inc.*,
   545 F.3d 1316 (Fed. Cir. 2008)..................................................................... 30

*Trading Techs. Int'l Inc. v. eSpeed, Inc.*,
   595 F.3d 1340 (Fed. Cir. 2010)..................................................................... 12

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
   721 F.2d 1540 (Fed. Cir. 1983)................................................................. 19, 24

*Woodland Trust v. Flowertree Nursery, Inc.*,
   148 F.3d 1368 (Fed. Cir. 1998)..................................................................... 23

## **Statutes**

35 U.S.C. § 102 ....................................................................................... *passim*

35 U.S.C. § 103 ....................................................................................... *passim*

35 U.S.C. § 112 ....................................................................................... *passim*

35 U.S.C. § 282(c) ................................................................................... *passim*

## I.   PRELIMINARY STATEMENT

The Medicines Company sued Hospira, Inc. ("Hospira") for infringement of U.S. Patent Nos. 7,582,727 ("the '727 patent") and 7,598,343 ("the '343 patent") ("the patents in suit"). Hospira's Abbreviated New Drug Applications ("ANDAs") seek approval to commercialize a generic bivalirudin drug product before the expiration of the patents in suit.  Hospira asks this Court to invalidate the patents in suit under 35 U.S.C. §§ 102(b), 103, or 112.  The trial record shows that Hospira has failed to meet its burden of proving invalidity by clear and convincing evidence.  The patents in suit are valid and infringed.

## II.   NATURE AND STAGE OF THE PROCEEDINGS

In 2010, Hospira notified The Medicines Company that it had filed ANDA Nos. 90-811 and 90-816 with the FDA seeking approval to market a generic Angiomax[®] product before the '727 and '343 patents expire.  The Medicines Company sued Hospira for infringement (Civil Action No. 10-cv-700, D.I. 1), and the Court consolidated that litigation with Civil Action No. 09-cv-750, a related litigation concerning the same patents involving defendants Teva Parenteral Medicines, Inc., Pliva Hrvatska d.o.o., and APP Pharmaceuticals, LLC (collectively, "the other consolidated defendants").  The other consolidated defendants have settled.  D.I. 620 and D.I. 677.[1]  The Court conducted a bench trial on September 23-25, 2013.

## III.  SUMMARY OF THE ARGUMENT

Hospira has failed to prove by clear and convincing evidence that the asserted claims of the '727 and '343 patents are invalid under 35 U.S.C. §§ 102(b), 103, or 112.  As a threshold matter, Hospira's invalidity theories improperly rely on documents that were not properly disclosed under 35 U.S.C. § 282(c) (D.I. 779).  *Infra* Part V(A).  At trial, The Medicines Company objected to Hospira's untimely introduction of these documents, which included portions of a validation batch record (DTX-600A), a validation study (DTX-205), certificates of packaging (DTX-645), a laboratory notebook (DTX-624), and an email chain (DTX-110).

---

[1] Unless otherwise noted, docket entries refer to entries in this consolidated action.

Hospira should not be permitted to circumvent § 282's statutory notice requirements.

With or without these documents, Hospira has not met its burden to prove invalidity by clear and convincing evidence.  Hospira alleges several invalidity theories: § 102 (on sale), § 103 (obviousness), and § 112 (written description, enablement, and indefiniteness).  With respect to obviousness, Hospira fails to identify a motivation for a person of ordinary skill in the art ("POSA") to address the $Asp^9$-bivalirudin impurity problem solved by the patents in suit.  Specifically, Hospira relies on nonpublic information for this problem.  Hospira's obviousness arguments fail for this reason alone.  Moreover, Hospira identified only a single prior-art publication—which the Patent and Trademark Office ("Patent Office") considered before allowing the patents in suit to issue—for the alleged solution to this nonpublic problem.  *Infra* Part V(C)(1).  Hospira's attorneys and witnesses make multiple unsupported and conclusory statements because they cannot cite to or identify any additional evidence for its invalidity positions.  *Infra* Part V(C)(1)(b).  Conclusory statements and unsupported arguments cannot establish that the patents in suit are obvious, let alone constitute clear and convincing evidence.  As discussed in detail below, the prior art presented at trial teaches just the opposite—that high-shear mixing would cause foaming and further degradation of protein pharmaceuticals, demonstrating that the inventions were ***not*** obvious.  *Infra* Part V(C)(3)-(4).

Likewise, Hospira cannot support its on-sale arguments and failed to prove by clear and convincing evidence that: (i) the inventions were subject to a commercial sale or an offer for sale more than one year before the patents were filed[2]; and (ii) that the inventions were ready for patenting before such sale or offer—both of which are required for the on-sale bar to apply.  *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67-69 (1998); *Infra* Part V(B).  Further, the trial evidence demonstrates that the inventions were ***not*** ready for patenting before the critical date because the inventors did not recognize that Angiomax® made under the improved process ("Improved Angiomax®") worked for its intended purpose and had the claimed limitation of a maximum $Asp^9$ level of about 0.6% until after the 25th batch was made.  *Infra* Part V(B)(1)(b)-(c).  Thus,

_____

[2] The patents in suit were filed on July 27, 2008.  Thus, the "critical date" is July 27, 2007.

there could not have been: (i) a reduction to practice; or (ii) a written description that disclosed a maximum Asp[9] level of about 0.6%, until **after** the critical date.

In addition to the inventions not being ready for patenting, there was **no** commercial sale or offer for sale before the critical date. The admitted evidence and unrefuted testimony of Anthony Flammia demonstrate that The Medicines Company owned Improved Angiomax® throughout the manufacturing process and that it remained The Medicines Company's property—in a quarantined status and unavailable for sale—until after the critical date. *Infra* Part V(B)(2)(b). And even assuming The Medicines Company's third-party supplier, Ben Venue Laboratories ("Ben Venue"), sold or offered the inventions for sale, Hospira's argument still falls short because the alleged sale or offer for sale was not a "commercial" one. Hospira has failed to show by clear and convincing evidence that Improved Angiomax® was commercially sold or offered for sale before the critical date.

Contrary to Hospira's invalidity theories under § 112: (i) the inventors possessed their inventions at the time they filed their applications; (ii) a POSA could make and use the invention; and (iii) a POSA would understand the full scope of the inventions. *Infra* Part V(D)-(E). Hospira's conclusory § 112 invalidity arguments should be rejected. Without any credible evidentiary support, Hospira has failed to prove by clear and convincing evidence that the asserted claims are invalid for failing to meet the written-description, enablement, and definiteness requirements. *Infra* Part V(D)-(E).

## IV.  STATEMENT OF FACTS

### A.  The Medicines Company's Relationship with Ben Venue

The Medicines Company markets the drug Angiomax®, which comprises approximately 90% of The Medicines Company's sales. Tr. 70:15-22 (Flammia). Ben Venue began manufacturing Angiomax® under confidential conditions for The Medicines Company in 1997. Tr. 78:8-17 (Flammia). Ben Venue acted as a service provider for The Medicines Company and did not have title or property rights to the Angiomax® product that it manufactured. Tr. 73:2-13 (Flammia); Tr. 882:24-883:17 (Flammia); Tr. 874:1-7 (Flammia); DTX-29 at MEDCO4550170.

3

Ben Venue provided manufacturing services for The Medicines Company, which included processing the bivalirudin active pharmaceutical ingredient ("API") into Angiomax[®]. Tr. 73:5-24 (Flammia). Ben Venue invoiced The Medicines Company for these services. Tr. 882:24-883:17 (Flammia); DTX-29. Ben Venue did ***not*** sell the Angiomax[®] product to The Medicines Company. Tr. 882:24-883:17 (Flammia).

## B. The Asp[9]-Bivalirudin Problem

In 2005, a batch of Angiomax[®] failed due to high Asp[9] impurity levels. Tr. 75:4-77:6 (Flammia). Ben Venue investigated the impurity levels and attempted to fix the issue. Tr. 76:21-82:16 (Flammia); PTX-217.14-15. Despite Ben Venue's extensive experience in formulating bivalirudin since 1997, it could not solve the Asp[9] problem. PTX-27.3; PTX-217.14-15; Tr. 82:9-16 (Flammia); Tr. 121:4-17 (Musso); Tr. 921:4-922:14 (Klibanov). A subsequent batch failure due to high levels of Asp[9] impurity demonstrated that Ben Venue's attempts to correct the problem failed. Tr. 76:21-82:16 (Flammia); Tr. 121:4-17 (Musso); Tr. 921:4-922:14 (Klibanov); PTX-226.1. These batch failures and high Asp[9] impurity levels were not public. Thus, a POSA could not have known this problem existed, much less investigated how to address it. Tr. 113:2-115:1 (Musso); Tr. 118:14-18 (Musso); Tr. 755:14-18 (Johnson).

## C. The Development of Improved Angiomax[®]

In light of Ben Venue's failures to fix the Asp[9] problems, The Medicines Company hired a consultant, Dr. Musso, to investigate and develop an improved process for manufacturing Angiomax[®]. Tr. 86:1-87:22 (Flammia). During the investigation, Dr. Musso met with Ben Venue employees and identified at least ten potential causes for a high Asp[9] problem, including: (i) residual peroxides; (ii) residual perchlorates; (iii) speed of base addition; (iv) base viscosity; (v) timing of the base addition; (vi) mixing speed; (vii) properties of the precipitated bivalirudin; (viii) the location, within the tank, of pH addition; (ix) stirrer heights and location; and (x) batch scale. PTX-27; Tr. 116:11-23 (Musso). He also reported the Ben Venue consensus that, for compounding, the "base needed to be added fast." PTX-27.2.

Based on the co-inventors' efforts to solve the high $Asp^9$ levels in Original Angiomax®,[3] a new process was developed and 25 batches of Improved Angiomax® were produced.  Tr. 911:13-912:9 (Klibanov); Tr. 506:11-20 (Krishna); Tr. 515:21-24 (Krishna).  Only after the 25th batch of Improved Angiomax® was manufactured (around December 2007) and analyzed did the inventors determine that the improved process resulted in $Asp^9$ levels less than about 0.6%.  *Id.*

### D.   The Results of the Co-Inventors' Investigation

During the co-inventors' investigation, it was known that high-shear mixing was ***not*** suitable for use with protein-based drugs and could cause unwanted foaming and degradation. Tr. 914:18-918:15 (Klibanov); Tr. 922:18-923:14 (Klibanov); Tr. 120:13-121:3 (Musso). Indeed, when Ben Venue used a higher mixing speed, the batch foamed and overflowed.  PTX-216.75.  Additionally, high-shear mixing was known to cause temperature increases, which could also cause degradation.  Tr. 135:17-136:19 (Musso).  When Dr. Musso suggested to use high-shear mixing, it was surprising and unexpected that high-shear mixing could successfully help to minimize $Asp^9$ levels without excessive foaming.  Tr. 135:17-136:19 (Musso); Tr. 140:13-18 (Musso); Tr. 922:18-923:14 (Klibanov).

### E.   The Relationship with ICS Under the Distribution Agreement

The Medicines Company utilizes Integrated Commercialization Solutions ("ICS") as the exclusive distributor of Angiomax®.  DTX-84 (the "Distribution Agreement") at MEDCO4555472.  Two relevant ICS facilities are involved with Angiomax®: (i) ICS third party logistics ("ICS 3PL"), and (ii) ICS distribution centers.  *Id.* at MEDCO4555475; Tr. 861:6-865:2 (Flammia).  As stated in the Distribution Agreement, The Medicines Company maintains title to and control of Angiomax® product at the ICS 3PL facility.  DTX-84 at MEDCO4555472, 75. ICS does not take title of the product until ***after*** it is sent from the ICS 3PL facility and ***received at*** an ICS distribution center.  *Id.*; Tr. 861:6-865:2 (Flammia).

The Distribution Agreement does not mention Improved Angiomax®.  DTX-84.  Under

---

[3] Original Angiomax® refers to the Angiomax® product made before the inventions and is not covered by the patents in suit.

this agreement, The Medicines Company could accept or reject purchase requests from ICS. DTX-84 at MEDCO4555473.  The Medicines Company was not obligated to supply ICS distribution centers with Angiomax®.  *Id.*  An additional "underpinning transaction" was required to finalize a sale.  Tr. 851:13-24 (Flammia).  Otherwise, there was no agreement to sell, and the circumstances merely presented a "business framework." *Id.*

Angiomax® product was sent to ICS 3PL under quarantine status and was not available for sale until after the quarantine status was lifted.  *See* PTX-295; PTX-294.4, 10, 16.  After an underpinning transaction occurs, The Medicines Company sells nonquarantined batches of Angiomax® with the shortest remaining shelf life.  Tr. 862:23-863:7 (Flammia); Tr. 864:21-865:8 (Flammia).  Improved Angiomax® was not available for sale until after the July 2007 critical date when The Medicines Company moved the first Improved Angiomax® lots 896012, 896013, and 896014 from quarantine status to "available for sale."  PTX-294.4, 10, 16; PTX-295; Tr. 883:12-17 (Flammia).  Thus, any Angiomax® sold before the critical date would have been from the inventory of Original Angiomax®.  PTX-295; PTX-294.4, 10, 16; Tr. 826:18-827:1 (Flammia); Tr. 874:1-876:14 (Flammia); Tr. 878:9-882:10 (Flammia).

## V.   ARGUMENT

### A.   Hospira's Invalidity Counterclaims Should Be Dismissed Because Hospira Improperly Relies on Documents Not Disclosed in Its § 282 Notice

Hospira's invalidity arguments improperly rely on documents not identified in Hospira's § 282 notice (D.I. 779), including portions of validation batch records (DTX-600A), a validation study (DTX-205), certificates of packaging (DTX-645), a laboratory notebook (DTX-624), and an email chain (DTX-110).  This failure to comply with the patent statute alone is a sufficient basis to reject many of Hospira's invalidity arguments.  Under § 282, a party asserting invalidity or noninfringement is required to give notice, at least thirty days before trial, of:

> the country, number, date, and name of the patentee of any patent, the title, date, and page numbers of any publication to be relied upon as anticipation of the patent in suit or . . . as showing the state of the art . . . .  In the absence of such notice proof of the said matters ***may not be made at the trial*** except on such terms as the court requires.

6

35 U.S.C. § 282(c) (emphasis added).

At trial, The Medicines Company objected to Hospira's use of documents that were ***not*** identified in its § 282 notice.  Tr. 704:15-706:8 (Fleming); Tr. 709:3-711:3 (Fleming).  Hospira argued that its § 282 statement "incorporates by reference all pleading discovery responses, expert reports, and references cited therein as providing notice under § 282."  Tr. 704:21-705:4 (Horton); *see* D.I. 779.  But, as the Court correctly noted, "a § 282 notice that just says everything mentioned is incorporated by reference is probably defeating the purpose of the § 282 notice . . . ."  Tr. 710:4-9 (Andrews, J.).  The Court reserved judgment and permitted the parties to address the § 282 notice in post-trial briefing.  Tr. 710:19-711:2 (Andrews, J.).

Hospira relies on at least the following ***undisclosed documents*** (i.e., not in its § 282 notice): (i) DTX-600A; (ii) DTX-205; (iii) DTX-645; (iv) DTX-624; and (v) DTX-110:

- Hospira cites DTX-600A/DTX-205 to support its on-sale argument (§ 102) that the inventions were ready for patenting before the critical date.  *Infra* Part V(B)(1)(a), (c);

- Hospira cites DTX-645 to support its on-sale (§ 102) argument that there was a contract between The Medicines Company and ICS for the sale of Improved Angiomax®.  *Infra* Part V(B)(2)(b)(iv);

- Hospira cites DTX-624 to support its claim that the patents in suit are obvious (§ 103) in view of Hospira's nonpublic development efforts.  *Infra* Part V(C)(3)(c); and

- Hospira relies on DTX-110 to support its claim that the inventors did not invent bivalirudin with certain D-Phe[12] impurity levels (§ 112).  *See infra* Part V(D).  Without this document, Hospira has no evidence to support its claims that D-Phe[12] forms only during API synthesis—the basis for its D-Phe[12] written-description argument.  *Id.*

The Court should exclude these references because § 282 required their explicit disclosure.  Hospira's attempt to incorporate by reference "all pleadings, discovery responses, expert reports and references cited therein" (D.I. 779 at 1) does not comply with and undermines the purpose of § 282.  Hospira's failure to identify ***specific*** information, including "the country, number, date, and name of the patentee of any patent, [and] the title, date, and page numbers" of the references is clear.  35 U.S.C. § 282(c); *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1347 (Fed. Cir. 2003) (rejecting defendant's argument that plaintiff "was on notice because it participated in discovery, including a deposition and interrogatories, related to the prior art" and affirming the exclusion of evidence that was not

identified in a 282 notice); *Finisar Corp. v. DirecTV Grp., Inc.*, 424 F. Supp. 2d 896, 899 (E.D. Tex. 2006) ("Failure to comply with the very specific notice requirements of Section 282 is grounds for prohibiting introduction of evidence of the prior art.").  Hospira should not be permitted to rely on documents that were not disclosed in its § 282 notice.

**B.    The Patents in Suit Are Not Invalid Under § 102(b) Because the Inventions Were Not Ready for Patenting or Offered for Sale Before the Critical Date**

The on-sale bar requires proof of two conditions: (i) the product is "ready for patenting," ***and*** (ii) the invention is "the subject of a ***commercial*** offer for sale."  *Pfaff*, 525 U.S. at 66-68 (emphasis added).  To invalidate a patent under § 102(b), "the party claiming invalidity must establish both prongs of the *Pfaff* test by clear and convincing evidence."  *Netscape Comm'ns Corp. v. ValueClick, Inc.*, 684 F. Supp. 2d 699, 709 (E.D. Va. 2010) (citing *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009)).  Hospira failed to prove ***either*** prong of the *Pfaff* test and its § 102(b) invalidity arguments should be denied.

**1.    The Inventions Were Not Ready for Patenting Before the Critical Date**

To determine whether the ready-for-patenting prong of the *Pfaff* test has been met, courts analyze whether: (i) the invention was reduced to practice before the critical date; or (ii) the inventor prepared drawings or descriptions sufficiently specific to enable a POSA to practice the invention before the critical date.  *Pfaff*, 525 U.S. at 66-68.  Confirming Hospira's lack of evidence, Hospira's brief failed to: (i) even argue that the inventions were reduced to practice before the critical date; (ii) identify any enabling drawing or description; and (iii) acknowledge that the maximum $Asp^9$ level was not known or verified until after the critical date.

**a.    The Inventions Were Not Ready for Patenting Because the Maximum $Asp^9$ of About 0.6% Was Not Determined Until After the Critical Date**

As a threshold matter, the inventions of the patents in suit were not ready for patenting before the critical date because the maximum $Asp^9$ level of about 0.6% was not verified until after the 25th batch of Angiomax® was manufactured in December 2007 and later analyzed.  *See* Tr. 911:15-912:9 (Klibanov); Tr. 506:11-20 (Krishna); Tr. 515:21-24 (Krishna); Tr. 679:21-24

(Johnson).  To be ready for patenting, it must be "clear that no aspect of the invention was developed after the critical date."  *Pfaff*, 525 U.S. at 68 n.14.  As a result, "when development and verification are needed in order to prepare a patent application that complies with § 112, the invention is not yet ready for patenting."[4]  *Space Sys./Loral, Inc. v. Lockheed Martin Corp.*, 271 F.3d 1076, 1080 (Fed. Cir. 2001) (internal citations omitted); *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 343 F. Supp. 2d 272, 298 (D. Del. 2004), *aff'd*, 488 F.3d 982 (Fed. Cir. 2007) ("There can be no reduction to practice until the invention is sufficiently tested to demonstrate that it would work for its intended purpose.") (citation omitted).

Hospira's reliance on the validation batches and validation study are unavailing.  *See* Br. at 4-10[5]; DTX-598-600A; DTX-205.  The validation study only demonstrates, for FDA purposes, that the validation batches met "the current approved specifications for finished product," which was the 1.5% $Asp^9$ limit.  DTX-205 at MEDCO4043394, 403.  Therefore, these batches only verified—for regulatory purposes—that the 1.5% $Asp^9$ specification limit was satisfied.  The inventors, however, did not recognize and appreciate the maximum $Asp^9$ level of about 0.6% until after the 25th batch in December 2007, well after the July 2007 critical date.  *See* Tr. 911:15-912:9 (Klibanov); Tr. 506:11-20 (Krishna); Tr. 515:21-24 (Krishna).  Thus, the inventions could not have been ready for patenting and could not have been on-sale.

### b.   Hospira Does Not Contend that the Inventions Were Reduced to Practice Before the Critical Date

An invention is reduced to practice when the inventor: (i) "constructed an embodiment or performed a process that met all the limitations;" ***and*** (ii) "determined that the invention would work for its intended purpose."  *In re Omeprazole Patent Litig.*, 536 F.3d 1361, 1373 (Fed. Cir. 2008) (citations omitted).  In *In re Omeprazole*, the Federal Circuit held that the inventions were ***not*** reduced to practice at the time of the trials because the inventors were uncertain that the formulation would work as intended.  *Id*. at 1373-75.

---

[4] To the extent that Hospira alleges the patents in suit did not meet the § 112 requirements (*infra* Part V(D), (E)), the inventions could not have been ready for patenting.

[5] "Br. at __" refers to Hospira, Inc.'s Opening Post-Trial Brief on Invalidity, D.I. 810.

Like *In re Omeprazole*, the inventors did not appreciate that the improved process generated a maximum Asp[9] level of less than about 0.6% until an analysis was performed on the 25 batches included in Example 5 of the patents in suit.  Tr. 145:24-146:3 (Musso); Tr. 506:11-20 (Krishna); Tr. 911:15-912:9 (Klibanov); Tr. 506:11-20 (Krishna); Tr. 515:21-24 (Krishna).  Thus, the patented inventions were not reduced to practice until after the manufacture of the 25th batch in December 2007, well after the July 2007 critical date.  Tr. 911:15-912:9 (Klibanov).

Hospira's brief does not argue or present any evidence that the inventions of the patents in suit were reduced to practice before the critical date.  Hospira has failed to meet its burden of proving reduction to practice by clear and convincing evidence.

### c.   Hospira Does Not Cite to Any Enabling Drawings or Descriptions

Hospira failed to identify any reference that ***fully*** disclosed the inventions before the critical date.  *See* Tr. 910:22-911:4 (Klibanov).  Hospira relies on documents related to validation batches of Angiomax® (DTX-598-600A), a validation study (DTX-205), and a purported "master batch record."  *See* Br. at 9-10.[6]  But these exhibits are not enabling because they lack critical elements of the asserted claims.

### i.   The Validation Batches and Study Are Not Enabling Disclosures of the Inventions Because They Lack Critical Claim Elements

The documents Hospira relies upon (DTX-598-600A and DTX-205)[7] do ***not*** "disclose each element of the asserted claims."  Tr. 910:22-911:4 (Klibanov); *see* Br. at 10.  Instead, Hospira's expert provides only a "high level," conclusory opinion about the validation batches

---

[6] As discussed above in Part V(A), the Court should exclude DTX-600A and DTX-205 from its analysis because Hospira failed to disclose them in its required § 282 notice.

[7] Hospira references an Angiomax® "master batch record" (or "MBR").  But no such document was admitted or shown at trial.  Br. at 3-4, 7-10.  The ***executed*** batch records that Hospira cites (DTX-598-600A) are not the same as a MBR and include documents prepared on other dates— some over six months ***after*** the manufacture of the batches—such as certificates of manufacture, certificates of analysis, and deviation reports.  *See, e.g.*, DTX-598 at MEDCO4103347-48, 56-72.  Hospira's unsupported arguments regarding the MBR should be rejected.  *See, e.g.*, *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327-28 (Fed. Cir. 2012).

and briefly "paraphrase[s]" selected portions of DTX-598.  Tr. 678:21-679:14 (Johnson); Tr. 684:21-687:7 (Johnson).  Hospira's analysis of DTX-598-600 is limited to a single figure that Hospira argues shows the "placement of the high shear mixer and feed tube used for 'efficient mixing.'"  Br. at 10.  This analysis does not mention or apply the Court's *Markman* construction, and it falls far short of proving by clear and convincing evidence that the diagram discloses, e.g., efficient mixing, let alone every other element of the asserted claims.

Moreover, these documents do not enable a POSA to practice the inventions because they do not disclose critical claim elements.  Notably, they do not disclose a "maximum impurity level of $Asp^9$-bivalirudin that does not exceed about 0.6%."  *See* DTX-598-600A; DTX-205; PTX-1.15, claim 1; PTX-2.16, claim 1.[8]  Because these documents do not disclose critical patent claim elements, they do not satisfy the *Pfaff* ready-for-patenting inquiry.  Hospira failed to prove its § 102(b) on-sale arguments by clear and convincing evidence.

### 2. Improved Angiomax® Was Not Sold or Commercially Offered Before the Critical Date

Even if the inventions were ready for patenting before the critical date, Improved Angiomax® was not sold or offered for sale before the critical date.  Tr. 883:12-17 (Flammia).  The commercial-offer prong of the *Pfaff* test is "separated into two distinct, constituent elements: (i) a commercial offer for sale, and (ii) a sufficient degree of identity between the product offered for sale and the patented invention."  *Netscape*, 684 F. Supp. 2d at 710 (citations omitted).

### a. Ben Venue Never Sold Improved Angiomax®

Hospira creatively argues that The Medicines Company's use of a contract manufacturer to prepare Angiomax®—i.e., Ben Venue—constituted a sale of the inventions.  But Hospira ignores the unrefuted trial record demonstrating that Ben Venue was a ***mere service provider*** that did ***not*** have title to Angiomax®.  Tr. 874:1-876:14 (Flammia); Tr. 882:24-883:17 (Flammia); DTX-29 at MEDCO4550170.  Hospira also ignores controlling precedent concluding that a

---

[8] All that is disclosed is the regulatory specification limit of ***1.5%*** $Asp^9$.  *See infra* Part V(B)(1)(a); DTX-598 at MEDCO4103356; DTX-599 at MEDCO4103635; DTX-600 at MEDCO4103868; DTX-600A at MEDCO4071518; DTX-205 at MEDCO4043403.

supplier's agreement to make a product for "[the inventor's] own secret, personal use could not constitute a sale under . . . § 102(b)" because the inventor "did not sell or offer for sale anything embodying the invention." *Trading Techs. Int'l Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1361-62 (Fed. Cir. 2010). The Federal Circuit held that "[i]nventors can request another entity's services in developing products embodying the invention without triggering the on-sale bar." *Id.* Ben Venue never sold Angiomax® and never owned any Angiomax® that it could have sold. Tr. 874:1-876:14 (Flammia); Tr. 882:24-883:17 (Flammia); DTX-29 at MEDCO4550170.

### i.   Ben Venue Was Merely a Service Provider

In arguing that Ben Venue sold Angiomax® to The Medicines Company, Hospira relies solely on DTX-29—a compilation of documents containing Ben Venue invoices. Br. at 11-12. But the specific pages that Hospira relies upon and cites (MEDCO4550164-65) to show the purported sale of batches 896012 and 896013, ***do not exist*** in Hospira's DTX-29 and were not introduced at trial. Hospira ignores that the documents in DTX-29 unequivocally state that the Ben Venue invoices were ***not*** for the sale of Angiomax®, but were instead "Charge[s] to ***manufacture*** Bivalirudin lot . . . ." *See, e.g.*, DTX-29 at MEDCO4550170 (emphasis added). At trial, Mr. Flammia testified that "[t]hose Ben Venue invoices to The Medicines Company were invoices for services rendered . . . ." Tr. 882:24-883:17 (Flammia). When specifically asked if they were for the sale of product, Mr. Flammia responded: "They were not." *Id*.[9]

### ii.   Ben Venue Did Not Have Title or Property Rights in Angiomax®

Hospira asserts that under *Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353 (Fed. Cir. 2001), sales from suppliers can trigger the on-sale bar. Br. at 12. But in *Special Devices*, the defendant did "not contest" that the agreements "constituted an offer to sell [the invention at issue] for purposes of section 102(b)." *Special Devices*, 270 F.3d at 1355. Moreover, Hospira *Special Devices* confirms that "[a] 'sale' under this bar occurs when the parties offer or agree to

---

[9] The Medicines Company also disputes that the payment of the manufacturing services invoices evidences a "binding sales contract" with Ben Venue. Br. at 12. Not only were the invoices of DTX-29 not for the "sale" of Angiomax®, but Hospira also failed to identify any "sales contract" with Ben Venue. Nothing in the record supports the existence of such a contract.

reach 'a contract . . . to give and ***pass rights of property*** for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.'" *Id.* (internal citations omitted) (emphasis added); *see Baxter Healthcare Corp. v. Fresenius Med. Care Holdings, Inc.*, No. 07-1359, 2010 U.S. Dist. LEXIS 21778, at *38 (N.D. Cal. Feb. 19, 2010). As explained above, Ben Venue was merely a "service provider" and therefore did ***not*** have property rights in Angiomax[®]. Tr. 73:5-13 (Flammia); Tr. 882:24-883:17 (Flammia). Accordingly, Hospira has failed to prove, let alone by clear and convincing evidence, that Improved Angiomax[®] was sold by Ben Venue.

### b.   The Medicines Company Did Not Offer to Sell Improved Angiomax[®] to ICS Before the Critical Date

Hospira relies on two documents, DTX-84 and DTX-645, to support its argument that The Medicines Company offered to sell Improved Angiomax[®] to ICS before the critical date.[10] Hospira ignores that both the trial testimony and the text of DTX-84 and DTX-645 show that Improved Angiomax[®] was ***not*** available for sale before the July 2007 critical date.

### i.   Hospira Mischaracterizes the ICS Distribution Agreement

Hospira repeatedly mischaracterizes the scope and content of DTX-84. First, Hospira represents that the Distribution Agreement replaces the "3PL Agreement." Br. at 13. But the Distribution Agreement states that "[t]he 3PL Agreement will continue in effect following the Effective Date . . . . Nothing in this Agreement shall affect the obligations of the Parties under the 3PL Agreement." DTX-84 at MEDCO4555472, 84. As Mr. Flammia's unrefuted trial testimony confirmed, the 3PL service agreement is "still in effect." Tr. 866:18-867:9 (Flammia).

Hospira further mischaracterizes the distribution agreement by arguing that "title to Angiomax[®] would pass from Medco to ICS 'upon receipt' of the product by ICS." Br. at 13. This is ***not*** the case. As the trial evidence demonstrates, there are two relevant ICS facilities involved with Angiomax[®]: (i) ICS 3PL; and (ii) the ICS distribution centers. Tr. 861:6-865:13 (Flammia); DTX-84 at MEDCO4555475. As stated in the Distribution Agreement, under the still-active 3PL agreement, The Medicines Company maintains title to Angiomax[®] at the ICS

---

[10] As discussed in Part V(A), Hospira did not identify DTX-645 in its required § 282 disclosures.

3PL facility, and ICS takes title only *after* it is received at an ICS distribution center.  DTX-84 at MEDCO4555475.

Finally, Hospira mischaracterizes the agreement as a "requirements contract."  Hospira's only "evidence" to support this claim is that, under the agreement, ICS was the exclusive U.S. distributor of Angiomax®.  *Id*. at MEDCO4555472; Br. at 14.  But the very next page of the agreement makes it clear that The Medicines Company is *not* obligated to supply Angiomax® and *can* reject any order placed by ICS.  DTX-84 at MEDCO4555473.  As confirmed by the trial record and Mr. Flammia's testimony, the Distribution Agreement was a mere "business framework, not an agreement to sell," which required an additional "underpinning transaction," i.e. separate orders by ICS.  *Id*. at MEDCO4555473; Tr. 851:13-24 (Flammia).

### ii.   The Distribution Agreement Was Not an Offer to Sell

A commercial offer for sale under § 102(b) must be one which the other party could make into a binding contract by simple acceptance.  Br. at 12; *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001).  As discussed above, ICS could not purchase Angiomax® by mere acceptance and was instead required to submit individual purchase orders that The Medicines Company could either accept or reject.  DTX-84 at MEDCO4555473.  Because, under the Distribution Agreement, ICS was unable to make a binding contract by simple acceptance for the purchase of any goods, the Distribution Agreement cannot be an offer to sell.  *See id*.  For this same reason, Hospira's reliance on the *Enzo* case is unavailing.  *See Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276 (Fed. Cir. 2005).  The agreement in *Enzo* required both Enzo to supply and Orzo to purchase from Enzo.  *Id*. at 1279.  Unlike *Enzo*, The Medicines Company is not obligated to sell Angiomax® to ICS.  DTX-84 at MEDCO4555473.

Furthermore, Hospira has not identified any evidence that The Medicines Company accepted a purchase order before the critical date that covered or even resulted in the sale of Improved Angiomax®.  Indeed, no Improved Angiomax® was sold, let alone available for sale, until *after* the critical date.  Tr. 826:18-827:1 (Flammia); Tr. 874:1-876:14 (Flammia); Tr. 883:12-17 (Flammia); Tr. 878:9-882:10 (Flammia); PTX-294.4, 10, 16; PTX-295.  Mr.

Flammia's testimony is unrebutted on this subject.  Because both the documents and trial testimony confirm that the Distribution Agreement is merely a business framework (*supra* Part II(B)(2)(a)), Hospira has failed to meet its burden to prove by clear and convincing evidence that the Distribution Agreement constituted an offer for sale.

### iii. Hospira Failed to Prove that the Distribution Agreement Concerned Improved Angiomax®

Even if the Distribution Agreement was an offer to sell a product (which it is not), Hospira has not met its burden of proving "a sufficient degree of identity between the product offered for sale and the patented invention." *Netscape Comm'ns*, 684 F. Supp. 2d at 710 (citations omitted).  The Distribution Agreement does not mention Improved Angiomax® and Hospira failed to prove that, at the time of the agreement, it concerned Improved Angiomax® as opposed to Original Angiomax®.  *See* DTX-84.  The contract has no signing date and Hospira did not establish a date.  Br. at 12; *see* DTX-84 at MEDCO4555471, 84.  Therefore, Hospira cannot prove that the contract does not predate Improved Angiomax® or the ready-for-patenting date.

Irrespective of whether the contract was proposed and/or entered in February 2007, Improved Angiomax® was not available for sale at that time.  Tr. 826:18-827:1 (Flammia); Tr. 874:1-876:14 (Flammia); Tr. 883:12-17 (Flammia); Tr. 878:9-882:10 (Flammia); PTX-294.4, 10, 16; PTX-295.  Instead, The Medicines Company only had inventory of Original Angiomax® available for sale.  *See* Tr. 883:12-17 (Flammia).  Because The Medicines Company sells lots with the shortest remaining shelf life, it would have sold the Original Angiomax® first.  Tr. 862:23-863:7 (Flammia); Tr. 864:21-865:8 (Flammia).  Indeed, The Medicines Company did not begin selling Improved Angiomax® to ICS until ***after*** the critical date, when it moved lots 896012, 896013, and 896014 from quarantine status to "available for sale" in August 2007. PTX-295; Tr. 878:9-882:10 (Flammia); Tr. 883:12-17 (Flammia).

Hospira's reliance on *Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.*, 726 F.3d 1370, 1377 (Fed. Cir. 2013) is also misplaced.  Br. at 16.  In *Hamilton*, a manufacturer's offer to

sell an invention was invalidating even though the patent holder had not authorized the manufacturer to make the invention.  *Id*.  But in this case, there is no evidence that ICS, or any other party, offered to sell the inventions to The Medicines Company.  Just the opposite, The Medicines Company had title to the products at issue and maintained them in a "NOT RELEASED QUARANTINE AS: . . . Pending Client/Mfr QA/QC Release" status.  PTX-294.4, 10, 16; DTX-645 at MEDCO4364016, 22, 28.  Because the Improved Angiomax® batches were *not* released and unavailable for sale, there was no offer and no binding contract could be formed by mere acceptance.  Tr. 826:18-827:1 (Flammia); Tr. 874:1-876:14 (Flammia); Tr. 883:12-17 (Flammia); Tr. 878:9-882:10 (Flammia); PTX-295; PTX-294.4, 10, 16.

### iv.  Hospira Mischaracterizes the Certificates of Packaging

Despite failing to raise the issue at trial, Hospira's post-trial brief now provides unsupported arguments that certain certificates of packaging (DTX-645) show that The Medicines Company was "performing under" a patent-invalidating sales contract.  Br. at 15.  As an initial matter, Hospira's argument relies on a *draft* facsimile that is not the operative document.  Tr. 878:9-16 (Flammia); Tr. 877:10-16 (Flammia); *cf* DTX-645 *with* PTX-294.  As shown in PTX-294, the three lots were shipped in a quarantined status to ICS 3PL on August 6, 2007.  PTX-294.1.  The status of these lots changed on August 16, 2007 when they became "available for sale."  PTX-295.  Furthermore, Hospira's brief ignores Mr. Flammia's unrefuted testimony on cross examination that The Medicines Company kept the batches in a quarantined status, unavailable for sale until *after* the critical date.  Tr. 826:18-827:1 (Flammia); Tr. 865:21-866:2 (Flammia).  Hospira selectively quotes from DTX-645 and ignores that the document states that each of the batches was "NOT RELEASED QUARANTINE AS: . . . Pending Client/Mfr QA/QC Release."  *See* PTX-294.4, 10, 16; Tr. 857:1-858:15 (Flammia).  Accordingly, Hospira has failed to meet its burden of proving, by clear and convincing evidence, that any sales contract existed for the sale of Improved Angiomax® before the critical date.

**C.   The Prior Art Does Not Render the Patents in Suit Obvious**

**1.   Hospira Cites Only One Prior-Art Document to Prove Obviousness**

Hospira's obviousness arguments rely on combining a single prior-art publication and the Original Angiomax® compounding process disclosed in the patents in suit.  The Amsberry publication (DTX-273) is a single paragraph that Hospira cites for the proposition that $Asp^9$-bivliaurdin is a known deamidation degradation product of bivalirudin.  Br. at 18.  But the Amsberry reference fails to mention many of the asserted claim elements and is therefore not sufficient, individually or in combination with the Original Angiomax® compounding process, to render the patents in suit obvious.  *See* DTX-273; PTX-2.13-14, col. 22 l. 21-col. 23 l. 4[11].  For example, neither Amsberry nor the Original Angiomax® compounding process discloses: (i) high-shear mixing conditions; (ii) slow and controlled base addition; and (iii) maximum $Asp^9$ impurity levels of less than about 0.6%.  *Id*.  Moreover, no changes in $Asp^9$ were even recorded in the Amsberry study.  *Id.*; Tr. 918:16-919:24 (Klibanov).  As Dr. Klibanov testified "in no way does this prior art reference even hint at the problem that was addressed by the patents in suit." Tr. 919:22-24 (Klibanov).  Hospira's Dr. Johnson admitted that "[t]hey looked for [Asp-9] in their study.  They didn't have it.  It wasn't a compounding.  ***It was a different purpose than what we're talking about*** . . . ."  Tr. 727:1-6 (Johnson) (emphasis added).  Accordingly, the differences between Amsberry and the inventions of the patents in suit are numerous and do not support Hospira's combination or a finding of obviousness.

**a.   The Patent Office Already Considered the References Hospira Relies Upon to Show Obviousness**

The Amsberry reference and the Original Angiomax® compounding process ***were*** disclosed to the Patent Office during the prosecution of the patents in suit.  PTX-2.2 (Identifying Amsberry under "OTHER PUBLICATIONS"); Br. at 17 ("Example 4 of the patents-in-suit describes the old compounding process.").  After considering these references, the Patent Office determined that the claims in the patents in suit are "both novel and free of the prior art."  PTX-

---

[11] The patents in suit share a common specification.  For the Court's convenience, The Medicines Company will primarily cite to only the '343 patent's specification.

7.908; PTX-8.1071-72.  "[T]he fact that references were previously before the PTO goes to the weight the court or jury might assign to the proffered evidence . . . it may be harder to meet the clear and convincing burden when the invalidity contention is based upon the same argument on the same reference that the PTO already considered."  *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012); *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1313 (Fed. Cir. 2011).  Hospira's obviousness arguments are not supported by clear and convincing evidence and should be rejected.

### b.   Hospira's Multiple Unsupported Assertions that Certain Information Exists in the Prior Art Should Be Rejected

Hospira's unsupported assertions as to what exists in the prior art should also be rejected. Hospira relies on unsupported, conclusory statements by Dr. Johnson that the prior art includes information rendering the patents in suit obvious.  Br. 18-22.  But conclusory statements by an expert cannot invalidate a patent for anticipation or obviousness.  *See, e.g.*, *ActiveVideo Networks*, 694 F.3d at 1327-28 (rejecting conclusory testimony about what a POSA would know because "[t]he expert failed to explain how specific references could be combined, which combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims").

Highlighting Hospira's failure to present evidence at trial, Hospira makes many assertions about the prior art based solely on the unsupported and conclusory statements of Dr. Johnson.  It would be improper for the Court to rely on such assertions.  *See ActiveVideo Networks*, 694 F.3d at 1327-28.  For example, Hospira alleges that the prior art discloses: (i) peptides could be subjected to high-shear mixing without adverse effects; (ii) literature from the FDA "required" pharmaceutical manufacturers to "reduc[e] impurity levels"; (iii) adding base more slowly and in a controlled manner removes human variability; (iv) precipitated bivalirudin "prevents the production of a suitable drug product"; (v) high-shear mixers were used extensively to break up and dissolve solids "of this type [referring to bivalirudin precipitate]"; and (vi) any danger from high-shear mixing exists only for peptides with secondary and tertiary

18

structure.  Br. 18-22.  Hospira's arguments without any reference to exhibits offered or admitted at trial should be rejected.  *See ActiveVideo Networks*, 694 F.3d  at 1327-28.  Hospira has not met its burden of proving by clear and convincing evidence that the patents are obvious in view of the prior art.

### 2.   Hospira Manufactures Motivations Based on Nonpublic Information

A party seeking to invalidate a patent based on obviousness must demonstrate "'by clear and convincing evidence that a skilled artisan ***would have been motivated*** to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success . . . .'"  *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (emphasis added) (citation omitted).

Further highlighting Hospira's lack of prior-art references, Hospira relies on The Medicines Company's ***confidential information*** to provide the alleged motivation for a POSA to recognize and address the Asp$^9$ problem.  Br. at 19.  Specifically, Hospira relies on two Original Angiomax® batch failures to establish that a POSA would have recognized and been motivated to address the Asp$^9$ problem.  *Id*.  But the failed batches were ***not public***.  Tr. 113:2-9 (Musso); Tr. 114:18-115:1 (Musso); Tr. 118:14-18 (Musso).  ***Dr. Johnson does not dispute this***.  *See* Tr. 755:14-18 (Johnson).  Hospira cannot rely on The Medicines Company's ***nonpublic information*** to provide a motivation for a POSA to combine prior-art references or to address problems in the Original Angiomax® manufacturing process.  *Cephalon Inc. v. Mylan Pharms. Inc.*, No. 11-164, 2013 U.S. Dist. LEXIS 101848, at *76 (D. Del. July 22, 2013) (finding no motivation where defendant did not show "that one of ordinary skill in the art, absent the benefit of [plaintiffs'] internal observations and documents, would have had any reason to suspect stability issues and, therefore, be motivated to solve such issues"); *see Dey, L.P. v. Sunovion Pharm., Inc.*, 715 F.3d 1351, 1355 (Fed. Cir. 2013) ("[S]ecret or confidential third-party uses do not invalidate later-filed patents . . . .") (citation omitted); *see also W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1549-50 (Fed. Cir. 1983), *cert. denied,* 469 U.S. 851 (1984) (noting that knowledge and usage has been interpreted to mean publicly known and used); *DatCard Sys., Inc. v.*

*Pacsgear, Inc.*, No. 10-1288, (C.D. Cal. Apr. 1, 2013) D.I. 164 Order at 8 (explaining that patents are not invalid "simply because the problems described in the specifications bore obvious solutions") (attached as Exhibit A). Indeed, Hospira's expert testified that he performed an extensive search and could ***not*** identify a single prior-art reference that discussed the sodium hydroxide addition and the generation of $Asp^9$ in the manufacture of a bivalirudin product. Tr. 751:23-753:13 (Johnson). Accordingly, Hospira has failed to prove a requisite element of its obviousness analysis. Hospira's § 103 arguments should be rejected for this reason alone.

To circumvent Hospira's lack of a trial record, Hospira's brief manufactures multiple unrelated and inconsistent motivations for a POSA to add base gradually and to mix at high speeds. Hospira's attorneys argue that a POSA, based on Amsberry, would modify the base addition and mixing steps "to reduce the formation of $Asp^9$-bivalirudin." Br. at 19-20. These arguments are unsupported. Amsberry does not disclose mixing or base addition. DTX-273. Unrelated to $Asp^9$ formation, Hospira provides different motivations for the method by which a POSA would modify those steps. Specifically, Hospira argues that a POSA would add base in a slow and controlled manner to reduce human variability, ***not*** to reduce $Asp^9$. Likewise, Hospira asserts that the motivation for increasing the mixing speed is to dissolve bivalirudin before lyophilization, which has ***no*** relationship to $Asp^9$ levels. Tr. 934:10-19 (Klibanov) ("[I]t's not essential to redissolve the entire glob to prevent further formation of Asp-9 impurity."). Hospira's arguments are ***not*** supported by a single reference or any trial testimony. Hospira's inconsistent theories further demonstrate that the inventions were ***not*** obvious. Furthermore, as discussed above, these purported motivations are either unsupported or, more tellingly, contradicted by the trial evidence. *Infra* Part V(C)(1); Part V(C)(1)(a); *supra* Part V(C)(3)(c); *see* DTX-273. The Court should reject these post-trial arguments.

Finally, Hospira's unsupported assumptions that a POSA would have known of the $Asp^9$ problem and would have employed high-speed mixing with slow and controlled base addition merely traces the inventors' steps. Such hindsight analysis is legal error. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1073 (Fed. Cir. 2012)

("[T]he district court merely retraced the inventor's steps. This hindsight analysis is inappropriate because obviousness must be assessed at the time the invention was made.")  Accordingly, Hospira has failed to prove, let alone by clear and convincing evidence, that a POSA would have recognized the problem of high $Asp^9$ levels and had any motivation to combine Amsberry with the prior art to achieve the claimed invention.

### 3.   The Trial Evidence Refutes Hospira's Obviousness Arguments

#### a.   The High $Asp^9$-Bivalirudin Problem Was Complex and Had Many Potential Variables

In an attempt to compensate for its lack of prior art, Hospira advances unsupported arguments and oversimplifies the number and type of variables that a POSA could manipulate in attempting to solve the $Asp^9$ problem addressed by the patents in suit.  Br. at 19-20.  In particular, Hospira argues that a POSA would examine "the method of base addition, and the method of mixing."  Br. at 20.  Hospira then incorrectly assumes that these are the only two variables that a POSA would seek to manipulate to solve the $Asp^9$ problem.  Br. at 20.  Based on this gross oversimplification, Hospira argues that there are a finite number of identified, predictable solutions, and the patents are therefore obvious.  Br. at 20.  But, as the Federal Circuit has often recognized, "[t]o the extent an art is unpredictable, as the chemical arts often are . . . 'identified, predictable solutions' may present a difficult hurdle because potential solutions are less likely to be genuinely predictable."  *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008); *see also In re Soni,* 54 F.3d 746, 750 (Fed. Cir. 1995) (referring to "the less predictable fields, such as chemistry, where minor changes in a product or process may yield substantially different results"); Tr. 181:16-19 (Bernat) (explaining that $Asp^9$ is formed through a deadmidation chemical reaction).

Hospira does not overcome this "difficult hurdle" because the trial evidence demonstrates that a POSA would consider many variables in an attempt to solve the $Asp^9$ problem.  For example, while investigating the high $Asp^9$ problem, Dr. Musso acknowledged many possible variables that could contribute to $Asp^9$ production.  PTX-27; Tr. 116:11-23

(Musso); PTX-27.2; s*ee* Part IV(C).  Accordingly, there were not "a finite number of identified, predictable solutions" to the Asp$^9$-bivalirudin impurity issue.  Br. at 20.

### b.   It Was Not Obvious to Add Base Slowly and in a Controlled Manner

Without citing any prior art, Hospira asserts that it would have been obvious and routine optimization to add base slowly and in a controlled manner because it removes "human variability."  Br. at 20.  Hospira fails to explain how adding a base slowly and in a controlled manner affects human variability or why other options, such as adding base all at once ***and*** in a controlled manner, would remove human variability more effectively than adding base slowly and in a controlled manner.  Dr. Johnson testified that the use of a "mechanical" method of base addition (as opposed to the speed and manner of the base addition) removes human variability.  Tr. 719:12-720:20 (Johnson).  But Dr. Johnson's testimony does not support Hospira's post-trial argument because a mechanical method is not the same as a slow and controlled method.  For example, the Original Angiomax® process utilized a mechanical method to add base—i.e., a pressurized nitrogen injection—quickly and all at once, which generated high levels of Asp$^9$.  PTX-217.8.  In any event, mechanical methods of base addition (as Dr. Johnson admitted) are ***not*** part of the claims of the patents in suit.  Tr. 788:4-13 (Johnson).  Without support from the prior art or its expert, Hospira is left with only attorney argument.  Hospira has failed to show by clear and convincing evidence that it was obvious to add base slowly and in a controlled manner.

Furthermore, Ben Venue's and The Medicines Company's investigations into the Asp$^9$ problem undercut Hospira's arguments and show that slow and controlled addition of base was ***not*** obvious or routine.  *See* PTX-27.  For example, when faced with the Asp$^9$ problem, Ben Venue's attempted solution was to add base rapidly and in multiple portions.  PTX-27.3; PTX-217.14-18; Tr. 80:6-82:16 (Flammia); Tr. 121:7-17 (Musso); Tr. 921:4-922:14 (Klibanov).  Moreover, when Dr. Musso began his investigation into the second failed batch, he reported the Ben Venue consensus that "base needed to be added fast."  PTX-27.2; Tr. 116:11-23 (Musso).  This trial evidence confirms that there was no motivation or expectation of success and that it was ***not*** obvious to add base in a slow manner when compounding bivalirudin.

### c.   It Was Not Obvious to Utilize High-Shear Mixing

The trial evidence also demonstrates that high-shear mixing was not an obvious solution to the high Asp[9] problem and, contrary to Hospira's arguments, was not routinely used to mix peptide pharmaceuticals.  Br. at 21.  Contrary to Hospira's arguments, the prior art did not disclose "that peptides could be subjected to high-shear mixing without adverse affects."  Br. at 18.  The only support for Hospira's statement comes from Dr. Johnson who testified that unidentified "literature" exists which shows that high-shear mixers have been used to process peptides and proteins, and that he has "personally" mixed proteins using high-shear mixing.  *Id.*; *see* Tr. 715:15-717:9 (Johnson).  Hospira did not offer any evidence of this "literature" and Dr. Johnson's personal experience—none with bivalirudin (Tr. 812:20-813:6 (Johnson))—has no bearing on what was publicly known or disclosed in the art.  Moreover, Hospira does not point to any document within the record that discloses the suitability of high-shear mixing for protein drugs, let alone that such mixing can be accomplished "without adverse affects."  *See* Br. at 18; *Stambler v. RSA Sec., Inc.*, 243 F. Supp. 2d 70, 72-73 (D. Del. 2003) (uncorroborated expert testimony was insufficient to meet the clear and convincing standard to invalidate a patent under § 102); *see also Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1373 (Fed. Cir. 1998) (concluding that oral testimony, by itself, did not provide clear and convincing evidence to invalidate a patent based on prior knowledge and use under § 102(a).

Contrary to Hospira's assertions, the record shows that the prior art ***taught away*** from the use of high-shear mixing.  Tr. 120:13-121:3 (Musso); Tr. 914:18-918:15 (Klibanov); Tr. 922:18-923-14 (Klibanov).  For example, Dr. Musso testified that peptides often experience foaming under vigorous mixing.  Tr. 120:13-121:3 (Musso).  Dr. Klibanov also testified that, "when you increase the mixing speed, you produce foaming, and foaming is something that sort of kills biopharmaceuticals.  It's something that leads to degradation of biopharmaceuticals."  Tr. 914:18-915:7 (Klibanov).  Unlike Dr. Johnson, Dr. Klibanov corroborated his opinion by discussing the following excerpt from the Akers article:

> [H]igh shear effects, e.g., high rates of mixing are known to cause foaming denaturation aggregation or oxidation of biopharmaceuticals [e.g., peptides] . . .

23

> advanced mixing technologies allow for efficient compounding of a final solution while minimizing shear effects that could produce foaming of the product and surface denaturation of the biomolecule.

Tr. 915:13-22 (Klibanov); Tr. 917:3-9 (Klibanov); Tr. 918:4-10 (Klibanov).

Likewise, Hospira asserts that a POSA would know that: (i) bivalirudin has no secondary or tertiary structure; and (ii) high-shear mixing can only pose a danger to peptides with secondary and tertiary structures. *See* Br. at 22.  For support, Hospira cites the testimony of its employee, Bryan Bernat. *See* Br. at 22; Tr. 440:6-442:10 (Bernat); Tr. 718:18-719:11 (Johnson). But, the evidence demonstrates that mixing at high speeds creates risks when manufacturing bivalirudin.  PTX-216.75; Tr. 799:16-800:6 (Johnson); Tr. 932:9-933:5 (Klibanov).  Increasing the mixing speed of an Original Angiomax® batch caused excessive foaming, ruining that batch. *Id.*  Moreover, Mr. Bernat's and Hospira's confidential knowledge has no bearing on what was ***publicly known*** in the art. *See Dey,* 715 F.3d at 1355 ("[S]ecret or confidential third-party uses do not invalidate later-filed patents."); *see also W.L. Gore & Assocs.,* 721 F.2d at 1549-50 (noting that knowledge and usage has been interpreted to mean publicly known and used). Instead, Mr. Bernat was required to "test" bivalirudin to determine its structure, demonstrating that it was ***not*** public knowledge.  Tr. 440:11-13 (Bernat); Br. at 22.

Finally, Hospira's argues that a POSA would increase mixing speed because a precipitate "prevents the production of a suitable drug product."  Br. 20.  That argument is unavailing.  The slower mixing in Example 4 of the patents in suit was sufficient to dissolve the precipitate.  PTX-2.13-14, col. 22 l. 21-col. 23 l. 4.  Thus, a POSA would not need to increase mixing speed to dissolve precipitated bivalirudin.[12]  *Id.*

Hospira has not demonstrated that the prior art teaches the use of high-shear mixers with proteins, let alone with bivalirudin, or that there was an expectation of success.  And because the prior art identified by Hospira's expert teaches away from using high-shear mixers, Hospira has

---

[12] Hospira argues that if it is found to infringe, the patents should be held obvious in view of its lab-scale tests.  Br. at 21 n.5.  But these tests constitute "Highly Confidential" nonpublic information and do not qualify as prior art.  DTX-624; *see, e.g., Dey,* 715 F.3d at 1355.  And, as discussed in Part V(a), Hospira failed to disclose DTX-624 in its § 282 notice.  D.I. 779.

failed to prove by clear and convincing evidence that it would be obvious to utilize high-shear mixing to solve the high Asp[9] problem.

### 4. The Evidence of Nonobviousness Demonstrates that the Patents in Suit Are Novel and Nonobvious

The patentee can rebut evidence of obviousness with objective indicia of nonobviousness. *In re Cyclobenzaprine*, 676 F.3d at 1076-77. Objective indicia of nonobviousness include satisfaction of a long-felt need, public acclaim, copying, teaching away, failure of others, unexpected or surprising results, and skepticism of others.[13] *Id.* at 1078. Objective indicia of nonobviousness may be the most "probative and cogent" evidence available to the decision maker in reaching a conclusion on the obviousness/nonobviousness issue. *See, e.g., Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008).

### a. The Prior Art Taught Away From the Inventions, Which Produced Unexpected Results

At trial, Dr. Klibanov explained that the prior art taught away from using high-shear or high-speed mixing with peptide drugs because it would cause unwanted foaming, denaturation, aggregation, or oxidation. Tr. 914:18-918:15 (Klibanov); Tr. 922:18-923-14 (Klibanov); Tr. 120:13-121:3 (Musso). In light of this prior art, it was unexpected that: (i) bivalirudin could be mixed using high-shear or high-speed mixing without excessive foaming or increased degradation; and (ii) bivalirudin could be mixed at higher temperatures, such as those that can be caused by high-shear mixing, without increased degradation. Tr. 135:17-136:19 (Musso); Tr. 140:13-18 (Musso); Tr. 922:18-923-14 (Klibanov). Because the inventions "went against the conventional dogma" of the prior art and produced unexpected results, the patents in suit are nonobvious. Tr. 923:8-14 (Klibanov).

---

[13] As Dr. Klibanov pointed out during trial, several other drug companies "have attempted to copy the invention of the patents in suit . . . ." Tr. 923:15-924:2 (Klibanov); Tr. 945:22-946:4 (Klibanov). Indeed, several of these companies have stipulated that their generic Angiomax[®] products would infringe the patents in suit. D.I. 620; D.I. 677.

### b.   Others Were Skeptical of the Inventions and Failed Where the Inventors Succeeded

Despite having over ten years of experience in formulating bivalirudin, Ben Venue was unable to solve the high Asp$^9$-bivalirudin problem.  PTX-27.3; PTX-217.14-18; Tr. 76:21-82:16 (Flammia); Tr. 121:4-17 (Musso); Tr. 921:4-922:14 (Klibanov).  Ben Venue attempted to solve the problem but a subsequent high-Asp$^9$ failure revealed that Ben Venue's efforts failed.  PTX-217.14-18; Tr. 76:21-82:16 (Flammia); Tr. 121:7-17 (Musso); Tr. 921:4-922:14 (Klibanov); PTX-226.  Additionally, during the development of the inventions, the experienced employees at Ben Venue expressed that the Asp$^9$ problem was "very difficult and very challenging."  Tr. 119:20-120:12 (Musso).  They stated that "one couldn't use high shear mixing on bivalirudin because high shear mixing was going to degrade the bivalirudin and generate higher levels of Asp-9 because it also generates heat at a point of stirring."  Tr. 134:16-135:8 (Musso); Tr. 136:6-15 (Musso); Tr. 140:13-18 (Musso); Tr. 154:15-24 (Musso).  Ben Venue's failure to solve the Asp$^9$ problem, its skepticism that the problem could be solved, and its belief that high-shear mixing could not be used with bivalirudin demonstrates that the inventions are nonobvious.

### D.   The Asserted Claims Satisfy the Written-Description Requirement

The written-description requirement has been met when "the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1313 (Fed. Cir. 2010) (quotations omitted).  The '727 patent generally concerns pharmaceutical batches that have a "maximum impurity level of Asp$^9$-bivalirudin that does not exceed about 0.6%" while the '343 patent claims those same pharmaceutical batches prepared by a "compounding process."  *See, e.g.*, PTX-1.15, col. 25 ll. 56-64; PTX-2.16, col. 27 ll. 16-17.  Hospira acknowledges that the patents disclose the "final Asp$^9$ value found in the finalized product."  Br. at 27.  Table 7 demonstrates that the inventors possessed pharmaceutical batches with maximum impurity levels of Asp$^9$ that did not exceed about 0.6%.  PTX-2.14, col. 23 l. 42-51.  Similarly, the specifications expressly disclose numerous ways to perform the claimed compounding process.  *See, e.g.*, PTX-2.5-8, col. 6 l. 54-col. 12 l. 29.  "[A] recitation of

how to make and use the invention across the full breadth of the claim is ordinarily sufficient to demonstrate that the inventor possesses the full scope of the invention, and vice versa." *Invista N. Am. S.a.r.l. v. M&G USA Corp.*, No. 11-1007, 2013 U.S. Dist. LEXIS 88646, at *62 (D. Del. June 25, 2013) (citations omitted). Here, the inventors possessed the full scope of their invention and the specifications meet the written-description requirement.

Hospira does not dispute that the specification discloses: (i) pharmaceutical batches that have a "maximum impurity level of $Asp^9$-bivalirudin that does not exceed about 0.6"; and (ii) the claimed "compounding process." Instead, Hospira argues that the asserted claims fail to meet the written-description requirement because "the patents must disclose both the starting $Asp^9$ level in the API and the amount of $Asp^9$ in the final product so that one skilled in the art can determine how much $Asp^9$ production is actually attributable to the claimed process." Br. at 27. But the asserted claims are directed to "pharmaceutical batches" (i.e., finished drug product)— *not starting $Asp^9$ levels of the API*. *See, e.g.*, PTX-1.15, col. 25 ll. 56-64; PTX-2.16, col. 27 ll. 14-31. Section 112 requires that "[t]he specification . . . contain a written description *of the invention*." 35 U.S.C. § 112 ¶ 1 (emphasis added). That requirement, however, does not extend to material that has not been claimed.

Tellingly, Hospira does not cite any trial testimony or provide any support for its contention that the patents claim $Asp^9$ levels in the API. In any event, the specifications do explain that the $Asp^9$ levels in the final product account for the $Asp^9$ levels in the API. PTX-2.8, col. 12 ll. 38-41. Specifically, the specifications state that "values for impurity levels [in the final product] *include those amounts generated by the synthesis of the active pharmaceutical ingredient [API] together* with those levels generated by the compounding process." *Id.*

Hospira also asserts that claim 7 of each asserted patent lacks written description because "the inventors *did not invent* a method for preparing pharmaceutical batches with the claimed 'maximum level of D-$Phe^{12}$-bivalirudin that does not exceed about 2.5% as measured by HPLC.'" Br. at 27 (emphasis added). Hospira's argument ignores the proper legal standard for written description. Novelty and written description are separate requirements. *See* 35 U.S.C.

27

§§ 102, 103, 112. Written description merely requires that the patents "reasonably convey" that the inventors had possession of their inventions. *Spine Solutions*, 620 F.3d at 1313. The patents do so and describe a maximum D-Phe[12] level of about 2.5%. PTX-2.4, col. 3 ll. 32-35, col. 4 ll. 38-41. In any event, claim 7 of each patent is a dependent claim, and a dependent claim is "*[a] fortiori*" novel because it contains all of the limitations of the independent claim from which it depends. *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100, 1107-08 (Fed. Cir. 1987); *see also Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1576 n.36 (Fed. Cir. 1987). The Court should reject Hospira's arguments with respect to claim 7 of the asserted patents because Hospira has failed to demonstrate by clear and convincing evidence that the underlying claim 1 does not meet the written-description requirement.

Finally, Hospira asserts that claims 2 (0.4%) and 3 (0.3%) are invalid "to the extent that Medco argues (as it did at trial) that the asserted claims are limited by the disclosure of Example 5 in the specifications . . . ." Br. at 28. But Hospira does not cite any portion of the trial transcript to support its arguments. As an initial matter, the patents describe the inventions of claims 2 and 3. PTX-2.6, 9 col. 8 ll. 58-61, col. 13 ll. 25-31. Moreover, Dr. Musso explained that the asserted claims are ***not*** limited to the disclosure of Example 5. Tr. 127:8-17 (Musso). Specifically, Dr. Musso testified that "[t]here are several locations within the detailed description of the invention that describe various components of what comes together for various elements of the efficient mixing . . . . They are on Columns 9, 10 and 11 within the Detailed Description, starting on Column 9 on Row 47." *Id*. Because the asserted claims are not limited by the disclosure of Example 5 in the specification, Hospira's written-description argument with respect to claims 2 and 3 should be rejected. Hospira has failed to meet its burden of proving by clear and convincing evidence that the specifications do not convey to a POSA that the patentees possessed their inventions.

### E.     The Asserted Claims Are Enabled and Definite

Hospira fails to meet its burden of proof on enablement. A patentee satisfies the enablement requirement if it teaches one skilled in the art how to make and use the full scope of

the claimed invention without undue experimentation. *Koito Mfg.Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1155 (Fed. Cir. 2004).  Hospira argues that the asserted claims lack enablement because "the specification is silent as to the number of samples needed to determine the maximum $Asp^9$ level."  Br. at 29.  But the Court's definition of "pharmaceutical batches" allows for "a single batch" to be "representative of all commercial batches . . . ."  (D.I. 732 at 1-2.) Thus, in the ANDA context, the specifications teach that a single batch is needed to determine the "maximum" $Asp^9$ level.  *See, e.g.,* Tr. 350:23-351:11.  "The enablement requirement is met if the description enables any mode of making and using the invention."  *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1071 (Fed. Cir. 2005).  Here, a POSA could practice the claimed inventions without undue experimentation by manufacturing a single batch as part of an ANDA filing.  The Court's construction also provides that "pharmaceutical batches" can be "[a]ll batches prepared by a same compounding process."  (D.I. 732 at 1-2.)  Thus, in a non-ANDA context, a POSA need only determine the "maximum" $Asp^9$ level for such batches.  Tr. 297:2-298:10 (Klibanov).  As explained below, the Court construed maximum to have its plain and ordinary meaning.

Instead of acknowledging that a single batch in the ANDA context can be used to determine the maximum $Asp^9$ level, Hospira relies on the testimony of Dr. Taylor and asserts that the "maximum increases over time as new batches are manufactured."  Br. at 29.  But Dr. Taylor based his opinion on a hypothetical scenario that assumed $Asp^9$ data followed a normal distribution.  Tr. 536:3-6 (Taylor); Tr. 557:1-23 (Taylor).  On cross-examination, Dr. Taylor admitted that Angiomax® $Asp^9$ data does ***not*** follow a normal distribution.  Tr. 567:18-569:4 (Taylor).  Thus, there is no reason to believe that Angiomax® $Asp^9$ data would increase over time.  *See* Tr. 569:20-571:24.  Hospira has failed to meet its burden of proof because Dr. Taylor based his opinions on an irrelevant hypothetical that has no relationship to Angiomax® $Asp^9$ data. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed. Cir. 1985) ("Lack of factual support for expert opinion going to factual determinations, however, may render the testimony of little probative value in a validity determination.").

Hospira also fails to meet its burden of proof with respect to definiteness.  A claim is definite when a POSA would "understand the bounds of the claim when read in light of the specification . . . ."  *Personalized Media Commc'ns, LLC v. U.S. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998).  Hospira asserts that "maximum" is indefinite because it has no meaningful claim scope for "all potential batches."  Br. at 30.  But Hospira's argument fails for at least three reasons.  First, Hospira ignores and reargues "maximum" as including "all potential batches."  *Id*.  The Court rejected this position and adopted The Medicines Company's proposal of plain and ordinary meaning.  *Markman* Hr'g Tr. at 4, Dec. 5, 2012.  Second, "[a] claim is indefinite *only* when it is 'not amenable to construction' or 'insolubly ambiguous.'"  *Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 898 (Fed. Cir. 2013) (citations omitted).  Because the Court construed "maximum" to have its plain and ordinary meaning, it is not indefinite.  Third, as explained *supra*, Hospira's Expert Dr. Taylor based his opinions on an irrelevant assumption.  Tr. 567:18-569:4 (Taylor).

During its opening statement, Hospira explained that its § 112 defenses were "primarily legal defenses" that would not "take a lot of trial time."  Tr. 36:13-24 (Lyerla).  Enablement and indefiniteness are based on underlying factual considerations.  *See, e.g., Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008).  By its own admission, Hospira did little, if anything, at trial to develop these factual considerations.  Hospira has not met its burden of clear and convincing evidence that the claims are invalid under § 112.

## VI.   CONCLUSION

Hospira failed to meet its burden of showing by clear and convincing evidence that any of the asserted claims are invalid.  The Medicines Company respectfully requests that the Court deny Hospira's invalidity counterclaims in their entirety and find all asserted claims valid.

December 6, 2013

*Of Counsel*

Edgar H. Haug
Porter F. Fleming
Angus Chen
Frommer Lawrence & Haug LLP
745 Fifth Avenue
New York, NY 10151
(212) 588-0800

 /s/ Frederick L. Cottrell, III
Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Jason J. Rawnsley (#5379)
rawnsley@rlf.com
Richards, Layton & Finger P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700

*Attorneys for Plaintiff*
*The Medicines Company*

## CERTIFICATE OF SERVICE

I, Jason J. Rawnsley, certify that on this 6th day of December, 2013, I electronically filed

**PLAINTIFF THE MEDICINES COMPANY'S RESPONSIVE POST-TRIAL BRIEF** with

the Clerk of Court using the CM/ECF system, which will send notification of such filing to

counsel for record.  I also served a copy of this document to the following counsel for Hospira,

Inc. by e-mail:

        Richard K. Herrmann
        Mary B. Matterer
        Morris James LLP
        500 Delaware Avenue, Suite 1500
        Wilmington, DE 19801
        rherrmann@morrisjames.com
        mmatterer@morrisjames.com

        Bradford P. Lyerla
        Sara Horton
        Aaron A. Barlow
        Jenner & Block, LLP
        353 N. Clark Street
        Chicago, IL 60654-3456
        BLyerla@jenner.com
        SHorton@jenner.com
        ABarlow@jenner.com

        */s/ Jason J. Rawnsley*
        Jason J. Rawnsley (#5379)
        rawnsley@rlf.com