# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE MEDICINES COMPANY,

                Plaintiff,

      v.

HOSPIRA, INC.,

                Defendant.

C.A. No. 09-750 RGA

**REDACTED PUBLIC VERSION**

 

## HOSPIRA, INC.'S POST-TRIAL RESPONSE BRIEF ON NON-INFRINGEMENT

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Bradford P. Lyerla
Sara T. Horton
Jamie Lord
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: 312 222-9350
Facsimile: 312 527-0484
blyerla@jenner.com
shorton@jenner.com
jlord@jenner.com

*Attorneys for Defendant Hospira, Inc.*

Dated: December 6, 2013
**Public version filed:  December 13, 2013**

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     FACTUAL BACKGROUND.................................................................................1

        A.      Hospira's Exhibit Batch...............................................................................1

        B.      Hospira's ANDAs........................................................................................2

        C.      The Court's Claim Construction..................................................................4

        D.      Professor Byrn's Calculation of Mixer Speed. ..........................................5

III.    ARGUMENT ..........................................................................................................6

        A.      Hospira Does Not Literally Infringe the Asserted Claims..........................7

                1.      Hospira Does Not "Efficiently Mix." ...........................................7

                        a.      Hospira does not add its pH-adjusting solution "slowly and
                                in a controlled manner" because its addition is rapid and
                                discretionary.......................................................................7

                        b.      Hospira does not mix under "high-shear mixing conditions
                                (*i.e.*, mixer speeds above 1000 rpms)" because its
                                convective mixer runs at 560 rpm.....................................12

                2.      Hospira's Exhibit Batch Is Not a "Pharmaceutical Batch" Because
                        It Is Not Representative of All Future Hospira Batches. ...........18

                3.      Hospira Does Not Meet the Limitation "a Maximum Impurity
                        Level of Asp$^9$-Bivalirudin that Does Not Exceed About 0.6%"
                        Because of Process Variability, and Hospira's Specifications
                        Provide for Higher Impurity Levels...........................................20

        B.      Hospira Does Not Infringe the Asserted Claims Under the Doctrine of
                Equivalents...............................................................................................24

                1.      Hospira's Base Addition Step Does Not Perform the Function of
                        Achieving Operator Independence Through Metered Addition to
                        Yield Batches With a Maximum Asp$^9$-Bivalirudin Level of 0.6%. ..........25

                2.      Hospira's Convective Mixer Does Not Perform the Function of
                        Particle Dispersion Through Mechanical Shearing Forces to Yield
                        Batches With a Maximum Asp$^9$-Bivalirudin Level of 0.6%. ....................27

IV.     CONCLUSION......................................................................................................28

i

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Gen. Elec. Co. v. Int'l Trade Comm'n*,
    685 F.3d 1034 (Fed. Cir. 2012)............................................................................................7

*Genentech, Inc. v. Wellcome Found. Ltd.*,
    29 F.3d 1555 (Fed. Cir. 1994)...........................................................................................25

*Morton Int'l, Inc. v. Cardinal Chem. Co.*,
    5 F.3d 1464 (Fed. Cir. 1993).........................................................................................6, 22

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
    731 F.3d 1271 (Fed. Cir. 2013).........................................................................................22

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
    529 F.3d 1364 (Fed. Cir. 2008).........................................................................................24

*Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*,
    19 F.3d 1418 (Fed. Cir. 1994)...........................................................................................25

## I.    INTRODUCTION

Medco failed to prove at trial that three claim limitations are present in Hospira's accused product:  "efficient mixing," "pharmaceutical batches," and "a maximum impurity level of $Asp^9$-bivalirudin that does not exceed about 0.6% [or 0.4%/0.3%]."[1]  These limitations are present in each asserted claim.  Thus, Medco did not carry its burden of proving that Hospira's product satisfied every element of any asserted claim.  Because Hospira does not infringe three asserted claim elements, and the absence of any one alone is enough to defeat Medco's claim of infringement, the Court should grant judgment of non-infringement of all asserted claims.

## II.    FACTUAL BACKGROUND

This infringement case centers on Hospira's Abbreviated New Drug Application Nos. 90-811 and 90-816 to market a generic bivalirudin drug product for injection.  Hospira seeks approval to market bivalirudin once Medco's patent covering the bivalirudin molecule itself—a patent not at issue here—expires on June 15, 2015.

### A.    Hospira's Exhibit Batch.

In February 2008, Hospira manufactured one Exhibit Batch to support its ANDAs.  (PTX 170.1-23; Tr. at 180:16-20 (Bernat), 616:5-11 (Johnson).)  Hospira's Batch Record memorialized the process used to manufacture the Exhibit Batch.  (Tr. at 616:12-619:8 (Johnson).)  During that process, after dissolving the bivalirudin Active Pharmaceutical Ingredient ("API") in water and mannitol, Hospira's operator added sodium hydroxide to decrease the acidity (increase the pH) of the bivalirudin solution to an acceptable level for human injection.  (PTX 170.18-19; Tr. at 447:3-8 (Bernat), 618:18-619:8 (Johnson).)  Hospira added the sodium hydroxide pH-adjusting solution in three equal portions.  (PTX 170.19; Tr. at 447:3-8 (Bernat), 619:9-17 (Johnson).)  The

---

[1] In each asserted patent, Claim 1 recites 0.6%, Claim 2 recites 0.4%, and Claim 3 recites 0.3%.

first two portions were "added rapidly with about 2-minute mixing time," while the third portion was "added gradually over a period of approximately 10 minutes." (PTX 170.19; Tr. at 447:3-448:13 (Bernat), 619:9-17 (Johnson).) The Batch Record gave the operator no further instruction regarding how to perform this gradual third addition. (Tr. at 402:1-403:13 (Klibanov); *id.* at 447:9-23 (Bernat).)

Because "[p]roduct will fall out of solution and a white cloudy precipitate will form with the addition of the Sodium Hydroxide" that "will clear with sufficient mixing," the Batch Record instructed the operator to "[i]ncrease mixer speed as necessary to assure adequate agitation." (PTX 170.19.) Hospira mixed its solution with a convective mixer running at 560 rpm for 4 hours and 52 minutes. (PTX 170.19; Tr. at 619:18-620:9 (Johnson).) The size of the Exhibit Batch was 45 liters. (PTX 170.30.) The Exhibit Batch had an $Asp^9$-bivalirudin level of 0.1-0.2%. (PTX 179.10.)

B. **Hospira's ANDAs.**

A few months after the production of its Exhibit Batch, in August 2008, Hospira submitted its ANDAs to the FDA. (*E.g.*, PTX 43.13.) Hospira's two ANDAs are identical for purposes of this case and, like Medco, Hospira will refer to them together herein. In its applications, Hospira disclosed the results from its single 45-liter batch as well as the possible scale-up of its process for commercial production. (PTX 165.29.) Hospira stated that its commercial batches would be between 45 liters and 220 liters. (*Id.* at 165.31.) Hospira explained that "[w]ith the exception of batch size, the manufacturing process for the commercial batches will be identical to that for registration stability batches" (*id.* at 165.29), and that "[t]he commercial scale process contains the same unit operations and utilizes equipment of the same design and operating principles as used to produce the exhibit batches." (*Id.* at 165.32.)

2

Hospira's ANDAs included product specifications that, as amended, proposed using starting API (drug substance) with up to 0.7% Asp$^9$-bivalirudin and selling drug product (finished product) with up to 1.0% Asp$^9$-bivalirudin. (DTX 191 at H00178612, H00178630; Tr. at 457:3-459:8 (Bernat), 621:24-622:18 (Johnson).) Hospira proposed the 1.0% drug product limit to account for both inherent manufacturing variability in the compounding process as well as the use of less-pure API. (Tr. at 459:17-460:20 (Bernat).) If the FDA approves these limits, Hospira will be able to use drug substance with 0.7% Asp$^9$-bivalirudin and place on the market bivalirudin drug product that has as much as 1.0% of that impurity. (*Id.* at 621:24-622:18 (Johnson).)

Importantly, Hospira never told the FDA that the Asp$^9$-bivalirudin impurity level of its Exhibit Batch—*i.e.*, 0.1-0.2% Asp$^9$-bivalirudin—represented the level for all potential batches that it might make. (*Id.* at 460:24-461:18 (Bernat).) Medco's expert did not dispute this at trial. (*Id.* at 390:6-12 (Klibanov).) To be clear, an ANDA filer need not represent that future batches will have the same impurity levels as its Exhibit Batch. Rather, Hospira's submission of its Exhibit Batch demonstrated that Hospira is able to manufacture a generic bivalirudin drug product within its proposed specification. (*Id.* at 460:21-461:4 (Bernat).) Hospira could not represent that all future batches will have the same Asp$^9$-bivalirudin impurity level as the Exhibit Batch because process variability will affect the impurity levels of future batches. (*Id.* at 461:5-18 (Bernat).) Instead, Hospira represented only that any commercial batch that it sells will fall within its proposed product specifications. (*Id.* at 476:20-478:21 (Bernat).)

3

C.      **The Court's Claim Construction.**

Earlier this year, the Court construed three claim terms from the asserted '343 and '727

patents.

First, it defined "pharmaceutical batches" as, in relevant part, "a single batch wherein the

single batch is representative of all commercial batches and wherein the levels of impurities and

reconstitution time in a single batch represent levels for all potential batches made by said

process."  (D.I. 732 at 1-3.)   The Court applied the definition of "pharmaceutical batches"

provided in the patents themselves and noted that the batches must be made by the allegedly new

compounding process disclosed in the patents.  (*Id.* at 3.)  "Pharmaceutical batches" appears in

all of the asserted claims of both patents.

Second, the Court construed "wherein the batches have a pH adjusted by a base" to

require that "a pH-adjusting solution containing a base is added to a bivalirudin solution under

efficient mixing conditions."  (*Id.* at 3-6.)  The Court explained that the claim element required

"efficient mixing" because it characterizes "[t]he only novel aspect of both the '727 and '343

Patents[:] the special compounding process aimed at reliably reducing the amount of $Asp^9$ in

'pharmaceutical batches.'"  (*Id.* at 4-5.)  The "wherein the batches have a pH adjusted by a base"

limitation appears in all of the asserted claims of the '727 patent.

Third, the Court construed "efficient mixing" as "[a] pH-adjusting solution is added to a

bivalirudin solution slowly and in a controlled manner, and mixed together by a process

comprising high shear mixing conditions (*i.e.*, mixer speeds above 1000 rpms)."  (*Id.* at 6-7.)

The Court reasoned that the use of slow addition, controlled addition (*i.e.*, "at a constant rate or

controlled rate"), and high-shear mixing differentiated the alleged invention from the prior art.

(*Id.* at 10 (also noting that "[t]he proposal that the pH-adjusting solution be added in a

'controlled manner' receives further support from the inventor's description of a 'process

4

improvement strategy to assess the impact of process control wherein the base was added in a controlled (metered) and effectively dispersed (at the bivalirudin precipitate stage) manner'").) The Court did not condition its construction on the size of the pharmaceutical batch. Indeed, the Court did not discuss batch volume. Of course, the claims do not discuss or specify batch volume either. "Efficient mixing" is an element of each asserted claim in both patents.

In construing "efficient mixing," the Court chose not to include the portion of Hospira's proposed construction that "exclud[ed] any and all rapid addition of the pH-adjusting solution." (*Id.* at 11.) The Court reasoned that the limitation was "redundant" of the "slowly" element of its construction. (*Id.*)

### D. Professor Byrn's Calculation of Mixer Speed.

Following the Court's claim construction ruling, Medco's counsel provided one of its experts, Dr. Stephen Byrn, with a textbook co-authored by Warren McCabe entitled "Unit Operations of Chemical Engineering." (Tr. at 282:10-24 (Byrn); DTX 628.) Dr. Byrn had never used the book before receiving it from Medco's counsel. (Tr. at 283:1-7 (Byrn).)

Dr. Byrn used a set of equations from a section in the McCabe book concerning the blending of "miscible liquids" to purportedly convert Hospira's Exhibit Batch mixer speed of 560 rpm to a mixer speed for a batch size of 150 liters. (*Id.* at 277:1-5 (Byrn).) Miscible liquids are liquids that mix together readily to form a combined liquid solution, such as water and wine. (*Id.* at 652:14-23 (Johnson).) Dr. Byrn used an equation for miscible liquids because he erroneously believed that "efficient mixing" occurs when the pH-adjusting solution is first added to the bivalirudin solution, before any bivalirudin precipitate forms. (*Id.* at 277:6-279:10 (Byrn).) Dr. Byrn formed no opinion as to what Hospira's mixer speed would be when a solid precipitate was present in the bivalirudin solution. (*Id.* at 279:11-281:24 (Byrn).) Dr. Byrn also

admitted that he used the equations for a different purpose than that set forth by McCabe.  (*Id.* at 283:17-285:4 (Byrn).)

Using the McCabe equation from counsel, Dr. Byrn calculated that a mixer speed of 560 rpm at 45 liters is equivalent to 1248 rpm at 150 liters.  (*Id.* at 244:6-15 (Byrn).)  However, in performing his calculations, Dr. Byrn began with the assumption that efficient mixing would occur at the 150 liter batch size.  (*Id.* at 252:11-19 (Byrn).)  He also assumed that the impeller size of the mixer would remain the same, *i.e.*, be 5 centimeters, for batch sizes of both 45 liters and 150 liters.  (*Id.* at 260:21-261:18 (Byrn).)  He further assumed that the mixing time would be held constant for both batch sizes, as he was interested only in changing mixer speed "because of the Court's claim construction."  (*Id.* at 250:18-251:9 (Byrn) (mixing time held constant at 26.4 seconds).)  Dr. Byrn considered mixing time to be the time needed to cycle the tank contents five times, the definition of complete mixing that McCabe uses for miscible liquids.  (*Id.* at 254:23-256:6 (Byrn).)  However, he admitted that the Court's construction does not require the contents to circulate only five times.  (*Id.* at 255:4-9 (Byrn).)  Indeed, he acknowledged that a mixer speed of 560 rpm achieves the same mixing in a 150-liter batch as in a 45-liter batch if a longer mixing time or larger impeller is employed.  (*Id.* at 253:13-254:16, 261:11-268:1 (Byrn).)  Dr. Byrn offered, as a justification for his decision not to account for those parameters, that he did not believe changing them "would give us information based on the Court's claim construction." (*Id.* at 254:5-16 (Byrn).)

## III.   ARGUMENT

Medco failed to carry its burden of proving infringement by a preponderance of the evidence.  *See Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1468 (Fed. Cir. 1993) ("The patentee has the burden of proving infringement by a preponderance of the evidence.").  In

the immediately following section, we demonstrate Medco's failure to prove literal infringement. We then turn to Medco's failure to prove infringement under its doctrine of equivalents theory.

### A.       Hospira Does Not Literally Infringe the Asserted Claims.

Medco failed to prove that Hospira meets three claim elements that are present in each asserted claim:   (1) "efficient mixing;" (2) "pharmaceutical batches;" and (3) "a maximum impurity level of Asp$^9$-bivalirudin that does not exceed about 0.6% (or, for Dependent Claims 2-3, 0.4%-0.3%)."   Therefore, there is no literal infringement.  *See, e.g.*, *Gen. Elec. Co. v. Int'l Trade Comm'n*, 685 F.3d 1034, 1042 (Fed. Cir. 2012) ("For infringement, every element and limitation of a claim of the patent must be found in the accused device . . . .").

### 1.       Hospira Does Not "Efficiently Mix."

There are two parts to the Court's construction of "efficient mixing":   (1) the pH-adjusting solution must be added to the bivalirudin solution "slowly and in a controlled manner," and (2) the solutions must be "mixed together by a process comprising high shear mixing conditions (*i.e.*, mixer speeds above 1000 rpms)."   Medco did not prove that Hospira meets either part of the construction.

#### a.       Hospira does not add its pH-adjusting solution "slowly and in a controlled manner" because its addition is rapid and discretionary.

Hospira's base addition step does not constitute "efficient mixing" because Hospira adds its pH-adjusting solution neither (i) slowly nor (ii) in a controlled manner.

*First*, Medco did not prove that Hospira adds its pH-adjusting solution "slowly."  Hospira adds two-thirds of the solution "rapidly."  (PTX 170.19; Tr. at 619:9-17 (Johnson).)  Hospira divides its pH-adjusting solution into three portions and adds the first two portions in single pours followed by two minutes of mixing, *i.e.*, "rapidly with about 2-minute mixing time" according to the batch record instructions.  (PTX 170.19; Tr. at 447:3-20 (Bernat).)  These

7

additions alone defeat Medco's infringement claim.  (*E.g.*, Tr. at 634:12-635:1 (Johnson).)  The patents' example of inefficient mixing, Example 4, employs the very same type of addition. Example 4 describes adding the pH-adjusting solution "rapidly in multiple portions."  (PTX 1 at 21:59-62; *see also* D.I. 732 at 11 ("Example 4 of the patent does show generally that rapid addition of the pH-adjusting solution is inconsistent with 'efficient mixing.' That is why 'slowly is appropriate.").)  Indeed, Medco concedes that Hospira does not add these first two portions "slowly."  (Tr. at 400:22-24 (Klibanov).)

Medco relies entirely on Hospira's "gradual[]" addition of the third portion of pH-adjusting solution, but does not show how this addition undoes the "rapid" addition of the first two portions.  The Court's construction states that "[a] pH-adjusting solution is added to a bivalirudin solution slowly."  (D.I. 732 at 7.)  Medco impermissibly seeks to rewrite this construction to read that "*a portion of* a pH-adjusting solution is added to a bivalirudin solution slowly."  Nothing in the Court's construction provides for cherry-picking a portion of "a pH-adjusting solution" to show "slow[]" addition.  In fact, the Court indicated that "slowly" excludes "*any and all* rapid addition" of pH-adjusting solution.  (D.I. 732 at 11 ("[T]he proposed requirement excluding any and all rapid addition of the pH-adjusting solution to the bivalirudin solution is unnecessary. . . . The 'not rapidly all at once' and 'not rapidly in multiple portions' limitations are therefore ***redundant of the slowly limitation***." (emphasis added)).)

Medco argues that the third base portion is the "principal portion" on the ground that its addition is allegedly the "critical step" because it is the portion that "brings about a significant pH change . . . where the deamidation reaction leading to the $Asp^9$-bivalirudin impurity tends to occur."  (*See* D.I. 809 at 14, 18-19.)  This argument is without merit.  To begin, Medco relies solely on testimony from Dr. Klibanov, (*see id.*), that the Court should exclude as beyond the

scope of Dr. Klibanov's expert disclosures in this case.  At trial, Dr. Klibanov testified that significant pH change in the bivalirudin solution—leading to a sharp transition to a high pH level where $Asp^9$-bivalirudin formation occurs—arises only during addition of the third portion because "[t]he pH scale is a log based scale."  (Tr. at 339:9-340:20.)  Hospira objected to the testimony as beyond the scope of Dr. Klibanov's previously disclosed opinions because he did not previously opine that the log-based nature of pH measurements renders the third portion critical.  (*Id.* at 340:21-341:3.)  In response, Medco relied on Paragraph 22 of Dr. Klibanov's Supplemental Report.  (*Id.* at 341:5-10.)  This paragraph says nothing about the third portion delivering the bivalirudin solution to a pH region where $Asp^9$-bivalirudin formation occurs. Instead, it merely labels Hospira's third portion as "a critical portion" that is added gradually "to minimize drastic pH shift."  (Ex. 1 at ¶ 22.)

In any case, Dr. Klibanov was forced to backtrack on his ad-libbed new opinion during cross-examination.  After testifying that the third portion was critical because its addition formed the bivalirudin precipitate that caused hot spots leading to $Asp^9$-bivalirudin formation, (Tr. at 936:14-941:18), Dr. Klibanov conceded that Hospira's amended batch record directly contradicts his opinion because it states that "bivalirudin will precipitate and form a white cloudy solution ***once the first portion of sodium hydroxide is added***."  (*Id.* at 941:19-942:16 (emphasis added).) Thus, there is no basis in either the Court's construction or the record for looking at Hospira's third base addition as more important or in isolation such that it satisfies the claim limitation.  In fact, the opposite is true.

Furthermore, even if the gradual addition of the third portion were the only relevant addition—which it is not—Medco did not prove that this addition is made "slowly."  Hospira gives its operator no instruction on how to add the third portion "gradually over a period of

approximately 10 minutes;" the operator adds the portion at his discretion.  (*Id.* at 402:3-403:13

(Klibanov); *id.* at 447:9-23 (Bernat).)   Thus, an operator can add some of the third portion

rapidly.  For example, the operator can add 25% of the portion in a quick dump at minute 5 of

10.  (*See id.* at 403:14-24 (Klibanov).)  This addition, like the addition of the first two portions,

would be rapid rather than "slow[]."

In sum, Medco failed to prove that Hospira's "rapid[]" addition of the first two portions

of pH-adjusting solution followed by a "gradual[]" third addition falls within the scope of the

asserted claims.

*Second*, Medco makes no attempt to prove that Hospira adds its base in a "controlled

manner."   Medco's entire argument concerning controlled addition consists of a conclusory

recitation:

> [t]he third portion is the principal portion and Hospira's batch
> record states that this portion should be "added gradually over a
> period of approximately 10 minutes."   Hospira's addition of its
> pH-adjusting solution constitutes "slowly in a controlled manner"
> as required by the Court's construction of the term "efficient
> mixing."  Hospira's addition of the third portion is the critical step
> because this is the portion that brings about a significant pH
> change.

(D.I. 809 at 14 (internal citations omitted).)  Medco offers no explanation as to how Hospira's

additions are "controlled."  This deficiency alone is fatal to Medco's infringement case.

Even if Medco had sought to satisfy its burden of proving "controlled" addition, its

efforts would have been in vain.  The term "controlled" refers to "constant" and "metered."  (*See*

D.I. 732 at 10 ("Example 5 makes clear that addition of the pH-adjusting solution at a constant or

controlled rate is required . . . .  The proposal that the pH-adjusting solution be added in a

'controlled manner' receives further support from the inventor's description of a 'process

improvement strategy to assess the impact of process control wherein the base was added in a

controlled (metered) . . . manner.'".).)   "Controlled" addition removes operator variability to ensure a well-controlled process.  (*E.g.*, Tr. at 517:8-518:3 (Krishna).)

Hospira adds its first two base portions "rapidly" in single pours and adds the third portion "gradually" over ten minutes at the operator's discretion.  (Tr. at 447:9-448:6 (Bernat); *id.* at 402:3-403:13 (Klibanov).)  Medco had the burden to prove that both the rapid addition of the first two base portions and the gradual addition of the third portion are performed in a controlled, *i.e.*, constant or metered, manner.  However, Medco failed to prove that either type of addition is "controlled."

First, because Hospira's operator adds the first two portions in rapid dumps, there is no controlled rate of addition.  The operator adds the first portion, then mixes for approximately two minutes during which time no base is added.  (PTX 170.19; Tr. at 447:3-448:6 (Bernat), 619:9-17 (Johnson).)   Then, the operator performs a second pour, which can be at a different level of rapidity than the first pour.  After that, the operator mixes again for about two minutes and does not add any base.  (*Id.*)   An addition process consisting of two pours at different speeds, separated by periods of non-addition, is not metered or "controlled."

Second, the operator adds the third portion in a discretionary, rather than controlled, manner. The operator can choose to quickly (*i.e.*, rapidly) add a small amount at minute 2 of 10, much more in a prolonged pour at minute 5 of 10, and then dump in the rest at minute 8 of 10. (*See* Tr. at 403:14-24 (Klibanov).)  Alternatively, the operator could add a small amount each minute.  (*Id.* at 448:14-23 (Bernat).)  Because the possibilities are endless, each operator will add the pH-adjusting solution differently, using a different number of pours at different pouring speeds with a different amount of base in any given pour, separating the pours by different time intervals.  (*Id.* at 403:14-404:15 (Klibanov); *id.* at 448:24-449:8 (Bernat).)  Even the pours by a

11

single operator during a given compounding process will differ from one another. The discretionary lenience of Hospira's base addition renders the step non-"controlled."

In sum, Medco did not prove that Hospira meets the "slowly and in a controlled manner" portion of the "efficient mixing" limitation.

> **b.     Hospira does not mix under "high-shear mixing conditions (*i.e.*, mixer speeds above 1000 rpms)" because its convective mixer runs at 560 rpm.**

Hospira's mixing step also does not constitute "efficient mixing" because (i) Hospira employs a convective mixer, rather than a high-shear mixer, and (ii) Hospira does not use mixer speeds above 1000 rpms.

*First*, Hospira does not employ "high-shear mixing conditions" because it does not use a high-shear mixer. Rather, Hospira uses a convective mixer, *i.e.*, a paddle mixer, that simply pushes material around the mixing tank. (Tr. at 449:18-19 (Bernat), 619:18-620:1, 632:20-23 (Johnson).) Again, Medco makes no attempt to prove literal infringement of this claim element. Rather, Medco baldly asserts that "the Court's claim construction do[es] not require a specific type of mixer to achieve 'high shear mixing conditions.'" (*See* D.I. 809 at 14.) That is, Medco once more seeks to rewrite the Court's construction, this time eliminating entirely the phrase "high-shear mixing conditions" so that only mixer speed remains.

"High shear mixing conditions" necessarily require a "high shear mixer," which is a specific type of mixer that utilizes velocity gradients to exert strong forces on a solid or fluid element. (Tr. at 665:9-666:24 (Johnson).) Even according to the named inventors, a paddle mixer is distinct from a high-shear mixer because it cannot achieve this mechanical shearing effect. (*Id.* at 153:5-6 (Musso), 509:13-19 (Krishna).) Indeed, the Court found that the patents' discussion of the use of other mixing devices, such as paddle mixers, to achieve "efficient mixing" was inconsistent with the overall teaching of the patents. (D.I. 732 at 9-10.) Addressing

12

the paragraph in the patents stating that "efficient mixing" could be achieved by, "for instance, a paddle mixer . . . between about 100 rpm and 1000 rpm, or between about 400 rpm and about 800 rpm," the Court noted that "[t]his presents a contradiction as Example 4 clearly indicates mixing between 400 and 800 rpms is 'inefficient.'" (*Id.* at 10.)  The Court concluded that "[t]he contradiction should be resolved in favor of relying on what the inventor excluded from the scope of the patent" because, among other reasons, "the discussions within the Examples more cohesively frame which processes are novel and reliably reduce Asp[9], in comparison with the somewhat vague discussion cited by the Medicines Company." (*Id.*)  The patents' examples of "efficient mixing," Examples 3 and 5, both use a high-shear mixer (also known as a homogenizer (Tr. at 153:11-14)).  (PTX 1 at 20:19-21, 22:49-52.)  Thus, the use of a paddle mixer does not constitute "high shear mixing conditions."

*Second*, even if mixing speed were all that mattered, Medco failed to prove that Hospira mixes its pH-adjusting solution with the bivalirudin solution at mixer speeds above 1000 rpms. Medco does not dispute that Hospira mixed its Exhibit Batch at 560 rpms.  Therefore, Medco cannot prove that Hospira infringes the "mixer speeds above 1000 rpms" portion of the Court's construction.

Medco's argument that Hospira's mixing at 560 rpms for its 45-liter Exhibit Batch *literally* constitutes mixer speeds above 1000 rpms (specifically, 1248 rpms) makes no sense. Under Medco's infringement theory, Hospira's mixer speed—used for a 45-liter batch—must first be converted to a mixer speed for a 150-liter batch before it is compared with the asserted claims.  Essentially, Medco seeks to prove infringement by adding a volume requirement to the Court's construction so that it reads "mixer speeds *at a given batch size that translate to mixer speeds* above 1000 rpm *for a batch size of 150 liters*."  However, there is no restriction

13

anywhere in the Court's construction that the "1000 rpms" limitation applies only to a 150-liter batch size. The Court's opinion does not discuss volume sizes or the scaling of volumes. Tellingly, Medco never advocated a volume-based construction during *Markman* proceedings.

Medco places further restrictions on the Court's construction, arguing that mixer speeds be calculated using the McCabe equation under the scale-up assumptions used by Dr. Byrn. But Medco identifies no basis for using the McCabe equation to determine mixer speed (which is apparent from the setting on the mixer actually being used). One of ordinary skill in the art reading the patents would have no reason to look to the equation because the patents do not mention it. Indeed, the proponent of the equation in this case, Dr. Byrn, had never even used the McCabe book before Medco's counsel gave it to him during this litigation. (Tr. at 283:1-7.) In fact, a person of ordinary skill would not use an equation at all to determine mixer speed, but would rely instead on experimentation. (*Id.* at 648:6-652:13 (Johnson).)

Medco relies on the claim construction Opinion's discussion of Example 5, which involved a batch size of 150 liters, as mandating that the Court's construction be conditioned on that volume. (D.I. 809 at 15.) But, as Medco itself admits, "[i]t is improper to compare the accused product with a preferred embodiment in the patent's examples, instead of with the patent's claims." (*Id.* at 7.) The construction plainly requires "mixer speeds above 1000 rpms," and Hospira uses 560 rpms. Thus, Hospira does not literally infringe.

Even assuming *arguendo* that there were a 150-liter condition in the claims, Medco's infringement theory still fails for several reasons. *First*, a mixer speed of 560 rpms at 45 liters does not translate to a different mixer speed at 150 liters. Mixer speed can and will remain unchanged as volume increases without affecting mixing performance. The operator can simply use a larger impeller for the larger volume or mix for a longer period of time, while keeping the

mixer speed constant.   (Tr. at 253:13-254:16 (Byrn), 261:11-268:1 (Byrn), 657:20-659:1 (Johnson), 763:18-765:2 (Johnson).)  To use Dr. Byrn's analogy, a barista can stir a larger cup of coffee at the same speed to achieve the same mixing simply by using a bigger stirrer.  (*Id.* at 246:1-19 (Byrn).)  According to both parties' experts, a pharmaceutical manufacturer can easily purchase a larger, even custom-sized, impeller.   (*Id.* at 246:20-247:3 (Byrn), 412:21-413:4 (Klibanov), 659:2-6 (Johnson).)  In fact, Hospira would typically use a larger impeller size when scaling up a process so that the impeller is proportional to the size of the mixing vessel.  (*Id.* at 462:10-463:3 (Bernat).)

Medco does not account for these scale-up options because, according to Dr. Byrn, doing so "would [not] give us information based on the Court's claim construction."  (*Id.* at 254:5-16 (Byrn).)  That is, Medco considers only the approach that relies on increased mixer speed to maintain mixing levels upon batch scale-up.  By doing so, Medco is able to conjure a way to inflate Hospira's 560 rpm mixer speed to a speed above 1000 rpm.  But any batch size increase by Hospira would involve commensurate scale-up of impeller size and/or mixing time.  Thus, Medco's assertion that "[c]ommon sense and pharmaceutical manufacturing experience indicate that under the same conditions, good mixing is much easier to achieve in a smaller volume of liquid than in a much larger volume" proves nothing.  (D.I. 809 at 15-16.)  Good mixing may be more difficult to achieve at larger volumes than at smaller ones, but there are many ways to overcome this difficulty without increasing mixer speed.  By ignoring alternative means to maintain mixing upon scale-up, such as increasing impeller size or mixing time, Medco failed to prove that Hospira's mixer speed at 45 liters more likely than not translates to a different mixer speed for a larger batch size.

To be clear, Hospira did not represent to the FDA that it would maintain the same impeller size upon scale-up. (Tr. at 641:20-645:23 (Johnson).) Instead, it stated that its "commercial scale process contains the same unit operations and utilizes equipment of the same design and operating principles as used to produce the exhibit batches." (PTX 165.32.) That is, Hospira will not make significant high-level changes to its operations upon scale-up. (Tr. at 644:20-645:23.) Dr. Johnson, who has scaled up mixing processes in his personal work, (*id.* at 645:24-647:12), explained that specific equipment size parameters such as propeller diameter do not stay constant upon scale-up (*id.* at 645:7-23), and Dr. Bernat testified that Hospira is unlikely to increase its mixer speed when scaling up its process. (*Id.* at 494:2-22 (Bernat).)

*Second*, Dr. Byrn's calculation that Hospira's mixer speed of 560 rpm translates to a speed of 1248 rpm for a 150-liter batch is wrong. As an initial matter, a theoretical calculation does not accurately determine mixer speed for a scaled-up process. Experimentation is the appropriate means for determining any adjustment to mixer speed. (*Id.* at 648:6-652:13 (Johnson).) The McCabe reference itself states that, because mixing is "seldom highly reproducible," "[o]ften the criterion for good mixing is visual." (DTX 628 at H00182366, Tr. at 650:16-651:22 (Johnson).) Yet, Medco offers no experimental evidence of Hospira's mixer speed at the 150-liter batch size. Moreover, even if a calculation were applicable, the equation that Dr. Byrn used is inappropriate here. The equation applies to "miscible liquids," but mixing pH-adjusting solution with bivalirudin solution involves the formation of an immiscible precipitate. (*Id.* at 652:14-653:20 (Johnson).) As such, the equation is inappropriate.

Dr. Byrn attempted to justify his use of the equation on the premise that the relevant mixing step occurs upon initial addition of the pH-adjusting solution, before precipitation occurs. (*Id.* at 277:6-279:10.) Again, this argument seeks to re-write the Court's claim construction, this

time to read "[a] pH-adjusting solution is added to a bivalirudin solution slowly and in a controlled manner, and *initially* mixed together by a process comprising high shear mixing conditions (*i.e.*, mixer speeds above 1000 rpms) *before precipitation occurs*." The claims place no temporal limitation on when "efficient mixing" must occur. Rather, it must continue throughout the mixing of the two solutions. In fact, the patents teach that "efficient mixing" is critical during formation of the bivalirudin precipitate:

> Conversely, if the pH-adjusting solution is efficiently mixed with the bivalirudin solution, the formed precipitate is amorphous. The amorphous character allows for a more rapid re-dissolution of the precipitate and a better control of pH throughout the compounding process. Thus, process operations to control the pH transition through efficient mixing provide a significant process improvement and control of $Asp^9$-bivalirudin levels.

(PTX 1 at 9:3-17.) Thus, the McCabe equation is inapplicable here.

Even if the McCabe equation applied generally to mixing the pH-adjusting solution with the bivalirudin solution, Dr. Byrn violated a precept of the McCabe equation that requires tank diameter to be 2-4 times larger than impeller diameter. (Tr. at 656:7-657:9 (Johnson).) Dr. Byrn used a diameter ratio of over 11, rendering his calculation invalid. (*Id.* at 656:7-657:19.)

Moreover, Dr. Byrn's calculation bears no relation to the reality of Hospira's process. Dr. Byrn calculated a mixing time of 26.4 seconds, based on the assumption that mixing would be complete when the mixer turned over the tank contents five times. (*Id.* at 250:18-24, 254:23-256:6.) Comparatively, Hospira mixed its Exhibit Batch for 4 hours and 52 minutes. (PTX 170.19; Tr. at 619:18-620:9 (Johnson).) The enormous disparity between the mixing time used by Dr. Byrn and Hospira's actual mixing time shows that Dr. Byrn's methodology is too far removed from the actuality of Hospira's process to reliably predict how Hospira would scale-up the size of its batches, should it do so in the future. (Tr. at 655:7-656:5 (Johnson).)

For all of these reasons, MedCo has failed to prove that Hospira's mixer speed of 560 rpm for its Exhibit Batch is "above 1000 rpm."

### 2. Hospira's Exhibit Batch Is Not a "Pharmaceutical Batch" Because It Is Not Representative of All Future Hospira Batches.

Hospira's Exhibit Batch is not a "pharmaceutical batch" because the batch is not "representative of all commercial batches" and its impurity levels do not "represent levels for all potential batches made by" Hospira's compounding process. (*See* D.I. 732 at 1-2.) The "all [commercial / potential] batches" language of the claim construction is crucial here. It requires Medco to show that all of Hospira's future commercial or potential batches are represented by the Exhibit Batch. But Medco does not offer any proof regarding Hospira's future batches and focuses only on Hospira's Exhibit Batch. The Exhibit Batch cannot represent "all batches" because manufacturing process variability—owing to, for example, the use of different starting material, different operators, or different operating parameters such as mixing time—renders each batch different. (Tr. at 461:5-18 (Bernat), 624:10-625:21 (Johnson).) Process variability is an accepted aspect of pharmaceutical manufacturing. (*Id.* at 627:10-628:1 (Johnson).) Even the MAPP 5225.1 Guidance on the Packaging of Test Batches document on which Medco relies acknowledges process variability. (*Id.* at 372:11-373:13 (Klibanov).) At the very least, the variability will affect the impurity level of any potential future batch, such that the Exhibit Batch level of 0.1-0.2% $Asp^9$-bivalirudin does not represent the impurity level "for all potential batches." (*Id.* at 461:5-18 (Bernat), 624:11-625:21 (Johnson).) A future batch could have 0.3%, 0.7%, or some other amount of $Asp^9$-bivalirudin. Hospira increased its proposed specification limits for $Asp^9$-bivalirudin to 1.0% in part to account for this variability. (*Id.* at 459:17-460:20 (Bernat).)

Medco ignores the existence of process variability. Instead, it resorts to two arguments to allege that Hospira's Exhibit Batch is a "pharmaceutical batch." Medco argues that (1) "ANDAs are typically approved based on a single test batch, also called an exhibit batch," and (2) "the FDA requires that single exhibit batch to be representative of all commercial batches." (D.I. 809 at 10.) Both arguments are without merit.

*First*, it is irrelevant that an ANDA applicant uses an Exhibit Batch to support its application. Yet again, Medco attempts to change the Court's claim construction. This time, however, Medco does not simply add words to a construction but rather replaces the Court's construction wholesale to define a "pharmaceutical batch" as an "ANDA Exhibit Batch." But, the asserted claims do not say "Exhibit Batch," and they do not reference an ANDA application batch. (Tr. at 397:6-9 (Klibanov).) Instead, the claims require that a batch be "representative of all commercial batches" and have impurity levels that "represent levels for all potential batches." (D.I. 732 at 1-2.) An ANDA Exhibit Batch does not serve this function. Rather, it shows only that a manufacturer can make a drug product within its specifications. (Tr. at 460:21-461:4 (Bernat).)

*Second*, the FDA does not require that an Exhibit Batch be "representative of all commercial batches," and Hospira made no such representation. In support of its argument, Medco relies on (i) Hospira's statement to the FDA that "the commercial scale process contains the same unit operations and utilizes equipment of the same design and operating principles as used to produce the exhibit batches," and (ii) the MAPP document's statement that "it is critical that all testing be conducted on samples that represent the entire batch and mimic the product which will be marketed post-approval." (D.I. 809 at 11.) Neither statement says anything about an Exhibit Batch being "representative" of all batches. Hospira's statement simply indicates that

it will keep its overall design the same if it scales up its process.  (Tr. at 644:20-645:23 (Johnson).)  As already mentioned, the MAPP document acknowledges that there will be process variability, so its instruction that an Exhibit Batch "mimic" commercial batches must be read in the context of the entire ANDA filing and cannot mean that the Batch will "represent all future batches."  Such a reading would lead to a ridiculous result.  If Medco's reading were correct, Hospira would have to use the same operator, same tank, etc. for every batch.  (*See id.* at 806:5-807:12. (Johnson).)

Neither the fact that an Exhibit Batch is used to support an ANDA nor the generic statements upon which Medco relies concern the concept of a batch representing "all commercial batches and wherein the levels of impurities and reconstitution time in a single batch represent levels for all potential batches."  As such, Medco has no evidence that the Exhibit Batch is "representative" of future batches as that term is used in the patents.  Thus, MedCo cannot prove that Hospira's Exhibit Batch is a "pharmaceutical batch."

### 3. Hospira Does Not Meet the Limitation "a Maximum Impurity Level of Asp$^9$-Bivalirudin that Does Not Exceed About 0.6%" Because of Process Variability, and Hospira's Specifications Provide for Higher Impurity Levels.

As discussed in Hospira's Opening Brief on Invalidity, the claim term "maximum" is invalid under 35 U.S.C. § 112 because a person of ordinary skill in the art cannot determine the number of batches that must be considered to calculate the "maximum" value.  (D.I. 810 at 28-30.)  However, to the extent the number of batches can be defined, Medco must prove that the Asp$^9$-bivalirudin level for any of these batches most likely will never exceed 0.6%.  Medco does not even identify the number of batches that must be considered to calculate a maximum Asp$^9$-bivalirudin level, to say nothing about actually calculating this "maximum."  (*See* D.I. 809 at 21.)

Thus, Medco has failed to show that Hospira meets the limitation requiring "a maximum $Asp^9$-bivalirudin level that does not exceed about 0.6%." (*Id.* at 625:22-628:1 (Johnson).)

Moreover, Medco does not address the effect of process variability on Hospira's maximum $Asp^9$-bivalirudin level. Although Hospira's Exhibit Batch had less than 0.6% $Asp^9$-bivalirudin, some future batches are likely to exceed this level of impurity. (*Id.* at 499:5-500:13 (Bernat).)

In addition to process variability, Hospira's ANDA specification provides for a maximum $Asp^9$-bivalirudin level *above* 0.6%. Hospira has proposed using starting bivalirudin API with up to 0.7% $Asp^9$-bivalirudin. (DTX 191 at H00178612; Tr. at 458:14-20 (Bernat), 629:3-16 (Johnson).) $Asp^9$-bivalirudin levels do not decrease during compounding. (Tr. at 510:10-23 (Krishna), 771:11-16 (Johnson).) Although Medco's expert opined that $Asp^9$-bivalirudin levels would decrease during compounding if the degradation rate of $Asp^9$-bivalirudin to another substance exceeds the rate of $Asp^9$-bivalirudin generation, he admitted that he does not know whether this is ever the case, and Medco provided no evidence to support his speculation. (*Id.* at 924:22-926:16 (Klibanov).) Thus, Hospira's ANDA specifications guarantee, as a practical matter, that Hospira will market some batches with at least 0.7% $Asp^9$-bivalirudin because that much $Asp^9$-bivalirudin can be present in Hospira's API.

In fact, Hospira has proposed to sell batches with up to 1.0% $Asp^9$-bivalirudin. (DTX 191 at H00178630; Tr. at 458:24-459:8 (Bernat), 628:19-629:2 (Johnson).) Because the levels in Hospira's proposed specifications for starting API and drug product exceed the claimed maximum of 0.6% $Asp^9$-bivalirudin, MedCo falls far short of proving that Hospira infringes the "maximum impurity level of $Asp^9$-bivalirudin that does not exceed about 0.6%" limitation. It is more likely than not that Hospira's batches will have a maximum $Asp^9$-bivalirudin level that

exceeds about 0.6%. *See Morton*, 5 F.3d at 1469 ("Thus, there is only a possibility of the existence of the claimed compounds in the spectra, and that was not convincing enough to the court to prove infringement.").

Other than relying on the Asp$^9$-bivalirudin level of Hospira's Exhibit Batch as "representative" of all Hospira's future batches, (D.I. 809 at 20-21)[2]—demonstrated above to be incorrect—Medco's sole response to Hospira's specification limits is a misreading of the Federal Circuit's recent opinion in *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271 (Fed. Cir. 2013).  (D.I. 809 at 29-30.)  Medco asserts that "Hospira's noninfringement arguments based on its larger specification range fail as a matter of law" under *Sunovion* because "Hospira's specification permits an ANDA product that falls within the claimed impurity range" of 0.6% Asp$^9$-bivalirudin.  (*Id.* at 30.)  However, Hospira's specification does not permit a product within the claimed *maximum* impurity range of 0-0.6% Asp$^9$-bivalirudin.

In *Sunovion*, the claims at issue required "less than 0.25% levorotatory isomer." *Sunovion*, 731 F.3d at 1278.  The ANDA applicant sought approval for a product with not more than 0.6% levorotatory isomer.  *Id.*  The court found infringement because "when a drug manufacturer seeks FDA approval to market a generic compound *within the scope of a valid patent*, it is an infringement as a matter of law."  *Id.* at 1280 (emphasis added).

*Sunovion* is inapplicable here because Hospira's proposed specification of not more than 1.0% Asp$^9$-bivalirudin is not "within the scope" of the asserted patents.  The claim in *Sunovion* recited a compound with "less than 0.25% levorotatory isomer."  Thus, any substance with less

---

[2] Medco cites, *inter alia*, testimony from Hospira employee Brian Bernat for this proposition. (D.I. 809 at 21.)  Dr. Bernat testified only that the Exhibit Batch is representative of Hospira's "proposed commercial formula."  (Tr. at 180:21-24.)  He was not testifying in view of the patents or claim construction.  Indeed, Dr. Bernat was not involved in developing Hospira's non-infringement defense.  (*Id.* at 498:16-21.)

than 0.25% levorotatory isomer infringed the claim. The ANDA applicant proposed to manufacture at least some infringing product because it proposed to manufacture product with a range of 0.0-0.6% levorotatory isomer.

Medco's claims, on the other hand, require more than just any bivalirudin compound with less than 0.6% $Asp^9$-bivalirudin. They require that all batches made by a compounding process have "a maximum" $Asp^9$-bivalirudin level that does not exceed about 0.6%. This maximum applies to every batch created by the process.[3] An individual batch with less than 0.6% $Asp^9$-bivalirudin does not infringe the "maximum" limitation. The limitation is infringed only if all batches made by a compounding process do not exceed 0.6% $Asp^9$-bivalirudin. If a compounding process yields even one batch with more than 0.6% $Asp^9$-bivalirudin, Medco's allegation of infringement is defeated because the maximum for the compounding process exceeds 0.6%. Thus, *Sunovion* is inapplicable because, unlike the claim in that case, the scope of Medco's claims do not cover an individual batch with a claimed impurity level. Hospira has not proposed to market infringing product because it did not propose to use a compounding process that will always yield product with less than 0.6% $Asp^9$-bivalirudin.

In fact, Hospira has proposed just the opposite. The maximum $Asp^9$-bivalirudin for Hospira's compounding process is at least 1.0% according to its proposed specifications. (*Id.* at 629:17-21 (Johnson).) As such, Hospira's ANDAs do not fall "within the scope" of the asserted claims because they do not propose to market a product with a maximum $Asp^9$-bivalirudin level that falls within the claimed range of 0-0.6%.

---

[3] To obtain the asserted patents, Medco had to claim a "maximum" that applied to all batches because batches with less than 0.6% $Asp^9$-bivalirudin existed in the prior art. (D.I. 732 at 3.)

Because Medco's alleged proof that Hospira has "a maximum impurity level of $Asp^9$-bivalirudin that does not exceed about 0.6%" rests upon an erroneous interpretation of *Sunovion*, Medco has failed to prove infringement of this limitation. The analogous limitations of Dependent Claims 2 and 3 of each patent—which recite a maximum of 0.4% and 0.3%, respectively—are narrower in scope than the 0.6% limitation and, therefore, also are not infringed.

## B. Hospira Does Not Infringe the Asserted Claims Under the Doctrine of Equivalents.

Medco has also failed to prove that Hospira infringes the "efficient mixing" limitation under the doctrine of equivalents. Medco's doctrine of equivalents theory merely parrots portions of the Court's claim construction to assert equivalency. Medco provides no analysis to carry its burden of proving that Hospira's mixing process is equivalent to "efficient mixing."

At trial, the parties presented testimony regarding the Function-Way-Result test for determining infringement under the doctrine of equivalents. Under this test, the patentee has the burden of (1) defining the Function, or purpose, of a claim limitation, (2) identifying the Way, or means, in which the claimed invention performs this Function, and (3) defining the Result that the claim limitation achieves. The patentee must then show that the accused process performs substantially the same Function in substantially the same Way to reach the same Result as the claimed process. That is, the patentee must demonstrate that the differences between the two processes are merely insubstantial. *See, e.g.*, *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1376 (Fed. Cir. 2008) ("Whether equivalency exists may be determined based on the 'insubstantial differences' test or based on the 'triple identity' test, namely, whether the element of the accused device 'performs substantially the same function in substantially the same way to obtain the same result.'").

24

There are two steps to "efficient mixing," and Medco is required to prove equivalency for each: (1) the base addition step and (2) the mixing step. (*See* D.I. 732 at 7.) Medco fails to even attempt to prove equivalence of each step. Rather, it treats "efficient mixing" as a single step. Even then, Medco simply restates the Court's claim construction in attempting to define the Function, Way, and Result of "efficient mixing." Its definitions shed no light on the significance of the differences between Hospira's mixing process and "efficient mixing." Under the correct definitions, the significant differences between the two processes are evident.

> **1.    Hospira's Base Addition Step Does Not Perform the Function of Achieving Operator Independence Through Metered Addition to Yield Batches With a Maximum Asp$^9$-Bivalirudin Level of 0.6%.**

Medco's bare assertion that "[t]he function of the 'efficiently mixing' claim element is to achieve a desired mixing through the addition of a pH-adjusting solution slowly and in a controlled manner" simply repeats a portion of the Court's construction and references an undefined "desired mixing" objective. (*See* D.I. 809 at 18.) Medco does not identify any support in the patents for this definition of Function. *See Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1425 (Fed. Cir. 1994) ("A necessary part of the function/way/result equivalency analysis is the function of the substituted element as seen in the context of the patent, the prosecution history, and the prior art."). Because Medco identifies no basis for its definition of Function, its attempt to prove infringement under the doctrine of equivalents falters at the first hurdle. *See, e.g., Genentech, Inc. v. Wellcome Found. Ltd.*, 29 F.3d 1555, 1567 (Fed. Cir. 1994) ("[T]he evidence must be sufficiently particularized to meet the three prong test of equivalency . . . . If any one of the prongs is unsupported, the finding of equivalency cannot stand.").

Contrary to Medco's unsupported assertion, the actual Function of the base addition step in the patents is to achieve operator independence for the compounding process. (Tr. at 162:7-11

(Q. One of MedCo's or your goals with this paper was to minimize human variability from the process? A. That's a goal for anybody working in the pharmaceutical industry." (Musso)); *id.* at 660:3-661:7 (Johnson).)   According to the prosecution history, this feature differentiates the alleged inventive base addition step from the prior art.  (*See* D.I. 732 at 10 ("The proposal that the pH-adjusting solution be added in a 'controlled manner' receives further support from the inventor's description of a 'process improvement strategy to assess the impact of process control wherein the base was added in a controlled (metered) and effectively dispersed (at the bivalirudin precipitate stage) manner.'"); *see also id.* at 661:8-662:7 (Johnson).)

As discussed earlier, Hospira's "rapid[]" and "gradual[]" base additions at the operator's discretion subject its process to operator dependence.  The operator decides how much base to add in a given pour, when to make a pour, and how fast to pour.  In Hospira's process, each compounding step is performed in a unique manner.  Thus, Hospira's base addition step does not perform the same Function as the claimed base addition step.  (Tr. at 662:8-15 (Johnson).)

Hospira's process also does not perform its base addition step in the same Way as "efficient mixing."  The claimed process adds its base through metered addition, while Hospira adds base manually at the operator's discretion.  (*Id.* at 662:16-663:1 (Johnson).)  Hospira's addition involves operator-to-operator variability while the claimed process is operator independent.  (*Id.*)  Medco's characterization of the Way as mixing "by a process comprising high shear mixing conditions (*i.e.*, mixer speeds above 1000 rpms)," (D.I. 809 at 19), again restates a portion of the Court's literal claim construction.  Medco provides no support for this definition of the Way, which does not identify the manner (way) in which base is added to the bivalirudin solution.  (*See* D.I. 809 at 19.)  In any case, as discussed earlier in connection with

literal non-infringement, Hospira does not meet this limitation because it does not mix its bivalirudin solution under high-shear mixing conditions.

Finally, Hospira's base addition step also does not achieve the same Result as "efficient mixing." Medco argues that the Result is "reliably minimized levels of $Asp^9$-bivalirudin formed in the compounding solution not to exceed about 0.6%." (D.I. 809 at 19.) As discussed earlier, Hospira's process does not achieve a maximum $Asp^9$-bivalirudin of 0.6%.

Thus, Hospira's base addition step is not equivalent to "efficient mixing."

### 2.   Hospira's Convective Mixer Does Not Perform the Function of Particle Dispersion Through Mechanical Shearing Forces to Yield Batches With a Maximum $Asp^9$-Bivalirudin Level of 0.6%.

Medco does not differentiate the Function, Way, or Result of the base addition step from the high-shear mixing step. For the reasons discussed above with respect to the base addition step, at least Medco's Function and Way definitions are incorrect. Thus, Medco fails to prove infringement under the doctrine of equivalents for high-shear mixing as well. Moreover, even if Medco had articulated the correct Function-Way-Result framework, its doctrine of equivalents case for high-shear mixing would fail in application.

The Function of the high-shear mixing portion of "efficient mixing" is to break down solid bivalirudin precipitate particles to aid in dissolution and dispersion. (Tr. at 663:2-19 (Johnson).) The patents teach that the bivalirudin precipitate must be dispersed and dissolved quickly to minimize the generation of $Asp^9$-bivalirudin. (PTX 1 at 9:3-17 ("The amorphous character allows for a more rapid re-dissolution of the precipitate and a better control of pH throughout the compounding process.").) However, Hospira's convective mixer serves a different Function: to circulate the tank contents and achieve "adequate agitation." (*Id.* at 663:20-664:4 (Johnson); PTX 170.19.) The convective mixer does not break down solid bivalirudin particles to enhance dissolution.

Furthermore, Hospira's mixer does not work in the same Way as a high-shear mixer. The latter takes advantage of large velocity gradients to exert strong forces on particles. (Tr. at 665:9-666:14 (Johnson).) Hospira's convective mixer cannot generate these strong forces on particles. (*Id.* at 666:15-24.) It simply circulates the contents of a mixing tank. (*Id.* at 663:22-664:1.)

Finally, Hospira's mixer does not achieve the same Result as a high-shear mixer. Hospira's process does not yield batches with a maximum $Asp^9$-bivalirudin level of 0.6%. (*See id.* at 667:17-669:1.)

In light of the numerous differences between Hospira's process and "efficient mixing," Medco cannot prove that Hospira infringes the "efficient mixing" limitation under the doctrine of equivalents.

## IV.    CONCLUSION

Because Medco failed to prove that Hospira infringes the "efficient mixing," "pharmaceutical batches," or "maximum impurity level of $Asp^9$-bivalirudin" limitations present in each of the asserted claims, Hospira requests that the Court enter judgment that Hospira does not infringe any of Claims 1-3, 7-10, and 17 of the '727 patent, or Claims 1-3, and 7-11 of the '343 patent.

Dated: December 6, 2013

**Public version filed:  December 13, 2013**

_/s/ Mary B. Matterer_

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

Bradford P. Lyerla
Sara T. Horton
Jamie Lord
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: 312 222-9350
Facsimile: 312 527-0484
blyerla@jenner.com
shorton@jenner.com
jlord@jenner.com

_Attorneys for Defendant Hospira, Inc._

# EXHIBIT   1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE MEDICINES COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 09-750 (RGA) |
| | ) | (Consolidated) |
| HOSPIRA, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**<u>SUPPLEMENTAL EXPERT REPORT OF PROFESSOR ALEXANDER M. KLIBANOV</u>**

19.     Based on the foregoing, I believe that Hospira's Generic Bivalirudin meets the "efficiently mixing" claim limitation as construed by the Court in its July 12, 2013, order and thus literally infringes the asserted claims of the patents-in-suit.

20.     I expressly reserved my right to supplement my Opening Expert Report (¶ 166), including any arguments to the effect that a "corresponding element in Hospira's Generic Bivalirudin performs substantially the same function, in substantially the same way, and achieves the same result as the claimed element under the doctrine of equivalents."

21.     As explained below, Hospira's ANDAs indeed describe mixing a pH-adjusting solution with a bivalirudin solution to perform substantially the same function in substantially the same way to achieve substantially the same result as the "efficiently mixing" limitation as construed by the Court.

22.     The Court's Claim Construction Order (at 10) indicates that the function of the "efficiently mixing" claim element is to achieve a desired mixing through addition of a pH-adjusting solution slowly and in a controlled manner.  This is done to minimize levels of the $Asp^9$-bivalirudin impurity formed in the compounding solution.  Court's Claim Construction Order at 8.  *See, e.g.*, '343 patent, col.8: ll.56-58.  Hospira's mixing process performs ***substantially the same function*** because it also adds at least a critical portion of its pH-adjusting solution "gradually over a period of approximately 10 minutes"—*i.e.*, slowly and in a controlled manner.  Ex. 14 at H00001028; Ex. 15 at H00003160 to my Opening Expert Report.  I note that in Hospira's mixing process, two first portions of the pH-adjusting solution can be added "rapidly" and last portion should be added "gradually over a period of approximately 10 minutes" "to minimize drastic pH shift."  Ex. 14 at H00001028; Ex. 15 at H00003160 to my Opening Expert Report.  Hospira's attempt to require that all portions of the pH-adjusting

solution be added "rapidly" was rejected by the Court in its July 12, 2013, order.  Hospira's

process minimizes the levels of $Asp^9$-bivalirudin in the compounding solution.  *See, e.g.*, Ex. 23

at H00000909; Ex. 24 at H00003046 to my Opening Expert Report.  Moreover, the controlled

$Asp^9$ values for the drug product confirm that Hospira employed efficient mixing in preparing its

Generic Bivalirudin.  Ex. 9 at H00000121; Ex. 10 at H00002249; Ex. 23 at H0000909; Ex. 24 at

H00003045-46 to my Opening Expert Report.

23.     The Court's Claim Construction Order indicates that the way the pH-adjusting

solution and the bivalirudin solution are mixed is slowly and in a controlled manner and by a

process comprising high shear mixing conditions (*i.e.,* mixer speeds above 1000 rpms).

Hospira's exhibit batch is 45 liters and its process entails mixing the two solutions at 560 rpm.

Based on the conclusions of Professor Byrn's analysis, Hospira's mixing in its 45 liter exhibit

batch at 560 rpm is equivalent to mixing in a larger-scale, 150 liter batch (as provided in

Examples 4 and 5 of the patents-in-suit and relied upon by the Court's Claim Construction

Order) at 1248 rpm—*i.e., **in substantially the same way***.  The speed of Hospira's mixing is

equivalent to high-shear mixing conditions.  And, as discussed above, Hospira adds at least a key

portion of its pH-adjusting solution slowly and in a controlled manner.

24.     The Court's Claim Construction Order (at 10) indicates that the result of the

"efficiently mixing" claim limitation is mixing conditions corresponding to high-shear mixing

(*i.e.,* mixer speeds above 1000 rpms) and minimization of the $Asp^9$-bivalirudin formed in the

compounding solution.  *See, e.g.*, '343 patent, col.8: ll.59-61.  As discussed above, Hospira's

exhibit batch total volume is 45 liters and its process entails mixing a pH-adjusting solution with

a bivalirudin solution at 560 rpm.  Professor Byrn's analysis shows that to achieve the same

mixing in a 150 liter batch (as in Example 5 of the patents-in-suit and as relied upon by the Court